1   Patricia L. Peden (SBN 206440)
    E-mail:  ppeden@bwslaw.com
2   Ghazaleh Modarresi (SBN 259662)
    E-mail:  gmodarresi@bwslaw.com
3   BURKE, WILLIAMS & SORENSEN, LLP
    1999 Harrison Street, Suite 1650
4   Oakland, California 94612-3520
    Tel:  510.273.8780    Fax:  510.839.9104
5
    Attorneys for Light Field Labs
6

7

8                        UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10

11  Light Field Lab,                          Case No.

12              Plaintiff,                     **COMPLAINT FOR DECLARATORY
                                               RELIEF; DEMAND FOR JURY TRIAL
13          v.                                 [28 U.S.C. §§ 1332(a)(1), 2201(a)]**

14  Alan Jones,

15              Defendant.

16

17          Plaintiff Light Field Lab Corporation, a Delaware corporation ("Light Field Lab"), by and

18  through its attorneys, for its Declaratory Judgment Complaint against Defendant, Alan Jones,

19  alleges as follows:

20                                **THE PARTIES**

21          1.      Light Field Lab is, and at all times herein mentioned was, a Delaware corporation

22  authorized to and conducting business in the State of California with its principal place of business

23  located at 1920 Zanker Road Suite 10, San Jose, CA 95112.  ("Light Field Lab" or "Company").

24          2.      Light Field Lab is informed and believes that Defendant Alan Jones ("Jones") is

25  currently a citizen and resident of the State of Washington.  During the time period relevant to this

26  dispute, Jones was employed by Light Field Lab and worked in its offices in San Jose California.

27                            **JURISDICTION AND VENUE**

28          3.      This action seeks a judicial declaration to settle the parties' contractual dispute.

1  Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1332(a)(1), 2201(a).

2       4.    Light Field Lab and Jones have an actual and ongoing dispute concerning Jones's

3  entitlement to ownership interests in ███████ shares of the company's common stock.  Jones

4  threatens to sue to obtain the equity interest in these shares.  Light Field Lab contends that Jones

5  has no rights under the express terms of the Plan Documents.  Light Field Lab owns the disputed

6  shares.  Moreover, Light Field Lab cannot meet Jones's demands without violating the Plan's

7  rules.  Jones's demand for equity interests outside the Plan terms impacts the Company's ability to

8  issue new options already committed to Company's employees from a finite employee options

9  pool under the Plan.  Jones's demands have a real, present and ongoing impact on Light Field

10  Lab's business operations.  Light Field Labs faces an impossible choice:  either give Jones what he

11  demands and risk reneging on the commitments made to other current and prospective Plan

12  participants, or comply with the Plan and face litigation costs and risk from Jones's continued

13  threats to sue.  Light Field Lab needs a judicial interpretation of the Plan Documents to avoid

14  competing risk to its business.

15       5.    This Court has subject matter jurisdiction over this matter by virtue of diversity of

16  citizenship pursuant to 28 U.S.C. § 1332(a)(1).  Jones claims a right to stock equity interests

17  exceeding $75,000.  The amount in controversy therefore exceeds $75,000 exclusive of interest,

18  costs, and attorneys' fees.

19       6.    Jones is subject to personal jurisdiction in California.  This action arises out of

20  Jones's employment for Light Field Lab in California.  Jones purposefully availed himself of the

21  benefits of employment in California.  Exercise of jurisdiction by a California court to determine

22  rights from a stock incentive plan administered by his former employer in California comports

23  with fair play and substantial justice.  Jones consented to judicial proceeding in California when

24  he signed Light Field Lab's 2017 Stock Incentive Plan ("Plan"); the contract at issue in this

25  declaratory judgment action.

26       7.    Venue is proper in this judicial district.  The parties' Stock Option Agreement

27  includes a choice of venue provision wherein they agreed that any stock-related litigation "shall"

28  be conducted in state or federal court in California.  Exhibit A (Option Agreement ¶13). This

2

1  dispute concerns stock options granted as part of Jones's services to be performed and received in

2  this judicial district.

3  **FACTUAL BACKGROUND**

4  8.    Between 2019 and 2023, Jones was employed by Light Field Lab as a software

5  engineer.  Jones was an at will employee, with no written guarantee of continued employment.

6  9.    While an employee, Jones accepted stock option grants under Light Field Lab's

7  2017 Stock Incentive Plan ("Plan").  *See* Exhibit A.  The purpose of the Plan is to attract and

8  retain the best available personnel for positions of substantial responsibility, to provide an

9  additional incentive to employees, and to promote the success of the Company's business.  Exhibit

10  A at 6.  The terms and conditions governing the issuance of the Company's stock options are

11  found in three agreements:  the Plan, the Stock Option Agreement and the Exercise Agreement

12  ("Plan Documents.").  *See* Exhibit A.

13  10.    Stock option grants are not employee wages.  The Plan Documents stipulate that

14  stock options "are extraordinary items that do not constitute regular compensation for services

15  rendered to the Company . . . and are outside the scope of the Optionee's employment contract, if

16  any.  The Option and the Shares subject to the Option are not intended to replace . . .

17  compensation and are not part of the normal or expected salary or compensation for any purpose,

18  including but not limited to calculating severance payments, if any, upon termination."  Exhibit A

19  at 35 (Stock Option Agreement ¶11, No Acquired Rights) and at 39 (Excursive Agreement at ¶6,

20  No Employment Rights).

21  11.    On January 2, 2020, Jones confirmed, with his signature, that he agreed that any

22  options granted by Light Field Lab were "subject to the terms and conditions as set forth in the

23  Plan, Option Agreement and the Exercise Agreement documents."  Exhibit A at 2, 4-5.

24  12.    The Plan and Stock Option Agreement are integrated contracts. The Plan states "the

25  details of this Equity Award and the Documents set forth the entire understanding between you

26  and the Company regarding this Equity Award and supersede all prior agreements, promises

27  and/or representations on that subject."  Exhibit A at 1.  Likewise, the Stock Option Agreement,

28  which expressly incorporates the Plan, is fully integrated.  Exhibit A at 29, 35 (¶13(b) (Stock

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
OAKLAND
4877-5654-7720v1                                    3                    Case No.
COMPLAINT FOR DECLARATORY RELIEF;
DEMAND FOR JURY TRIAL
[28 U.S.C. §§ 1332(a)(1), 2201(a)]

Option Agreement).

13.     Light Field Lab stock option grants are not stocks; they are contracts that allow the option grant recipient to exercise options to purchase the common stock shares of Light Field Lab at a strike price.  Like most option contracts, Light Field Lab stock option grants allow the exercising of the options only during specific time periods.

14.     The purpose of the Plan is to incentivize employees to stay at the company.  The Plan Documents therefore require vesting of the option grants over time, and also treat vested and unvested options differently.  In exchange for remaining employed with the company, an employee would, periodically, earn vesting of the granted options and the ability to exercise the vested options. During the course of Jones's employment with Light Field Lab, he earned the vesting of ████ options.  At the time of his termination, he had unvested options for ████ shares.  Jones never earned the right to exercise unvested options because he did not remain employed with the company for the required period of time.

15.     The Plan Documents do not allow for any accelerated vesting of options.  All employees must remain with the company for the required length of time for their shares to vest. Unvested options may be treated as vested options only in limited circumstances involving a defined corporate transaction, such as a merger or acquisition.  Exhibit A Plan at ¶¶ 2(h), 7(c)(i)(1), 11.  No such corporate transaction has taken place.

16.     The Plan sets forth six post-termination exercise periods that vary depending on the reason for termination.  Exhibit A at 2.  If Jones was involuntary terminated, the Plan provided, consistent with IRS rules, an Option term of three months during which time he must exercise his options.  Exhibit A at 2; at 17 (Termination other than Upon Disability or Death or for Cause providing three months after termination to exercise options).  The Plan expressly provides that "[i]n no event may any Option be exercised after the expiration of the Option term as set forth in the Option Agreement (and subject to this Section 7)."  Exhibit A at 12 (Plan General Provisions) at 32 (Stock Option Agreement ¶5).

17.     The Plan set forth the procedure for exercising options, which required a written notice and full payment of the exercise price.  Exhibit A at 16 (Procedures for and Results of

1    Exercise) at 32 (Stock Option Agreement ¶3(iv)); at 37 (Exercise Agreement at ¶2).

2         18.    The Plan clearly reserved the Company's right to terminate an employee without

3    cause.  Exhibit A at 7 ("[Termination for cause] does not in any way limit the Company's ability

4    to terminate a Participant's employment or consulting relationship at any time . . ." *Id.* at 9(c) (<u>No</u>

5    <u>Employment Rights</u>:  "Neither the Plan nor any Award shall confer upon any Employee or

6    Consultant any right with respect to continuation of an employment [] relationship with the

7    Company . . . nor shall it interfere in any way with . . . the Company's [] right to terminate his or

8    her employment [] relationship at any time, without or without cause.").

9         19.    Jones also agreed to accept as binding, conclusive and final all decisions and

10   interpretations of the Administrator relating to his options.  Exhibit A at 34 (Stock Option

11   Agreement ¶8).

12        20.    Jones exercised his vested options on three occasions.  With each exercise, Jones

13   signed that he agreed that the Plan Documents governed the parties' rights and obligations with

14   respect to the stock options. Exhibit A at 4-5.  Before the expiration of his vested options, Jones

15   exercised the options for ███ shares of the company's common stock.  Jones owns those

16   shares, and they are not in dispute.

17        21.    On June 23, 2023, Light Field Lab terminated Jones's employment.  At the time of

18   termination, Jones had ███ vested options and ███ options that remained unvested.

19        22.    Jones's separation from Light Filed Lab set the time period in which he was

20   required to exercise his vested stock options to September 24, 2023, pursuant to Paragraph

21   7(c)(ii)(1)-(2) of the Plan.  Unlike his unvested options, Jones earned the right to exercise his

22   vested options before expiration.  Jones however, never attempted to exercise his vested options.

23   Consequently, Jones's right to exercise those vested options terminated and he has no further

24   rights to the stock equity of Light Field Lab.  Jones, however, asserts an entitlement to company

25   stock equity interest more than three months after his employment terminated, and in violation of

26   the Plan Documents.

27        23.    Jones asserts an entitlement to exercise both his vested and unvested stock options

28   after the three-month exercise period set forth in the Plan Documents.  Jones's assertion that he is

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Oakland

1   entitled to stock equity interest from unvested options is at odds with the Plan.  Allowing Jones to

2   obtain stock equity interest from his unvested options exposes Light Field Lab to claims it

3   breached of contractual obligations owed to other current and prospective participants.

4       24.    The option grants accepted by Jones and all rights to exercise the same are clearly

5   set forth and defined in the Plan.  Jones accepted the Plan.  Jones cannot now claim rights not

6   provided by the Plan.  Jones's insistence that he alone is exempt from the Plan exposes Light Field

7   Lab to real business risks.  Light Field Lab requires a judicial declaration of its rights and

8   obligations to Jones in order to resolve this ongoing controversy that impacts not only Light Field

9   Lab and Jones, but also the Plan and its present and future participants.

10   **FIRST CLAIM FOR RELIEF**

11   **(Declaratory Relief)**

12       25.    Light Field Lab repeats, reiterates and realleges each and every allegation of the

13   preceding paragraphs as if set forth herein, verbatim and fully at length.

14       26.    An actual controversy has arisen and now exists between Light Field Lab and Jones

15   concerning ownership rights to Light Field Lab's stock equity interest.

16       27.    There is a substantial controversy between Light Field Lab and Jones of sufficient

17   immediacy and reality to warrant the issuance of a declaratory judgment.

18       28.    A judicial determination that Jones has no rights to Light Field Lab's stock equity

19   interest will terminate the parties ongoing dispute and afford Light Field Lab relief from

20   uncertainty, insecurity, and the legal controversy giving rise to this proceeding.

21       29.    Light Field Lab did not breach the contracts that comprise the Plan Documents.

22   Jones breached the agreements.  Jones is entitled to no further consideration.

23       30.    In the absence of a resolution of the parties' present and ongoing dispute, Light

24   Field Lab will face legal uncertainty and the risk of financial harm.  Light Field Lab faces

25   competing financial risks.  Light Field Lab needs the security in knowing that it has no obligation

26   to Jones and will not continue to receive further demands and threats from him.  As a startup

27   company that must secure investment capital, threatened litigation is also harmful to Light Field

28   Lab's financial interests in securing additional investments, made more difficult when stock

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
OAKLAND

4877-5654-7720v1    6    Case No.
COMPLAINT FOR DECLARATORY RELIEF;
DEMAND FOR JURY TRIAL
[28 U.S.C. §§ 1332(a)(1), 2201(a)]

1    litigation is pending.

2    **PRAYER FOR RELIEF**

3        Declaratory Judgment Plaintiff, Light Field Lab, prays for judgment against Jones as

4    follows:

5        1.      That this Court declare that Jones never earned any right to Light Field Lab's stock

6    equity interest through his alleged unvested option grants and that the alleged vested stock options

7    to Jones expired three months after his employment at Light Field Lab ended.

8        2.      That Jones failed to comply with the Plan Documents and did not exercise his

9    shares.

10        3.      That Jones's demand for Light Field Lab's stock equity interest is not permitted by

11    the Plan Documents.

12        4.      That this Court declare that Light Field Lab has no further or ongoing equity-

13    related obligation to Jones.

14        5.      For costs of suit herein to the extent permitted; and

15        6.      For such other and further relief as the Court deems just and proper.

16

17    Dated:  October 19, 2023            BURKE, WILLIAMS & SORENSEN, LLP

18

19

20                        By: _____

                                Patricia L. Peden

21                            Ghazaleh Modarresi

                           Attorneys for Light Field Labs

22

23

24

25

26

27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
OAKLAND

4877-5654-7720v1                         7                        Case No.
COMPLAINT FOR DECLARATORY RELIEF;
DEMAND FOR JURY TRIAL
[28 U.S.C. §§ 1332(a)(1), 2201(a)]

# EXHIBIT A

 This option grant has been exercised. Certificates CS-15 , CS-13 and CS-14 have been created.

## Option grant holder

| Name | Alan Jones |
|---|---|
| Email | alan@jones.how |
| Grant reason | None entered |
| Status | Forfeited (Voluntary - Termination) |

## Quantities

| Original quantity | ███████ options (ISO) |
|---|---|
| Exercised quantity | ████ options |
| Remaining quantity | ███ options |
| Expired quantity | ████ option |
| Exercise price | ████ (USD) |

## Issuer

| Issued by | Light Field Lab |
|---|---|
| Issued from | 2017 Stock Incentive Plan |
| Grant date | Dec. 9, 2019 |
| Board approval date | Dec. 9, 2019 |
| Terminated | June 23, 2023 |
| Expiration | Sept. 23, 2023 |

## Acceptance agreement

When accepting this option grant on Carta, the option holder agreed to the following:

This Option Grant (the "Equity Award") is subject to all of the terms and conditions set forth in the applicable documents available for download in connection with this Equity Award (the "Documents"), all of which are incorporated herein in their entirety.

By entering your full name below, your signature will be applied to the Documents, as applicable, and you acknowledge receipt of, and understand and agree to the details of this Equity Award and the Documents. You further acknowledge that as of the date of this award, the details of this Equity Award and the Documents set forth the entire understanding between you and the Company regarding this Equity Award and supersede all prior agreements, promises and/or representations on that subject. If there is any conflict between the provisions of the details of this Equity Award and those of the Documents, the provisions of the Documents will control.

Plan Documents:
Equity Incentive Plan:      🔗 Light Field Lab – 2017 Stock Incentive Plan.pdf
Form of Option Agreement:   🔗 Light Field Lab – Form of Option Agreement.pdf
Form of Exercise Agreement: 🔗 Light Field Lab – Form of Exercise Agreement.pdf

*Alan Jones*

Alan Jones
01/02/2020    070e696a-351c-4449-84c7-b337dc918718

### Post-termination exercise periods

| | |
|---|---|
| Voluntary termination | 3 Months |
| Involuntary termination | 3 Months |
| Termination with cause | 0 Months |
| Death | 18 Months |
| Disability | 12 Months |
| Retirement | 3 Months |

Refer to your Equity Incentive Plan and Option Agreement for a more detailed explanation of post-termination exercise periods.

### Term

| | |
|---|---|
| Expiration of option grant | Dec. 8, 2029 |

### Summary

| | |
|---|---|
| Schedule name | ████████████ |
| Vesting start | ██████████ |
| Vesting terminated | ████████ |
| Cliff | █████████ |
| Vesting | ██████████████████████ |

### Progress

████ of the ██████ options █████ in ES-25 have vested. Shares will not vest after June 23, 2023 due to termination.

Vesting start: Sept. 30, 2019                                    Vesting terminated: June 23, 2023

Legend:    Exercised options    Vested options    ~~Terminated/expired options~~

| Period | Date | Options vested | Cumulative vested |
|---|---|---|---|
| 1 | Sept. 30, 2020 | ████ | ████ |
| 2 | Oct. 30, 2020 | ███ | ███ |
| 3 | Nov. 30, 2020 | ███ | ███ |
| 4 | Dec. 30, 2020 | ███ | ███ |

9/26/23, 4:17 PM
Case 4:23-cv-05344-YGR   Document 1   Filed 10/19/23   Page 11 of 53
Option grant - exercised via cash sale

| Period | Date | Options vested | Cumulative vested |
|--------|------|----------------|-------------------|
| 5 | Jan. 30, 2021 | ▮ | ▮ |
| 6 | Feb. 28, 2021 | ▮ | ▮ |
| 7 | March 30, 2021 | ▮ | ▮ |
| 8 | April 30, 2021 | ▮ | ▮ |
| 9 | May 30, 2021 | ▮ | ▮ |
| 10 | June 30, 2021 | ▮ | ▮ |
| 11 | July 30, 2021 | ▮ | ▮ |
| 12 | Aug. 30, 2021 | ▮ | ▮ |
| 13 | Sept. 30, 2021 | ▮ | ▮ |
| 14 | Oct. 30, 2021 | ▮ | ▮ |
| 15 | Nov. 30, 2021 | ▮ | ▮ |
| 16 | Dec. 30, 2021 | ▮ | ▮ |
| 17 | Jan. 30, 2022 | ▮ | ▮ |
| 18 | Feb. 28, 2022 | ▮ | ▮ |
| 19 | March 30, 2022 | ▮ | ▮ |
| 20 | April 30, 2022 | ▮ | ▮ |
| 21 | May 30, 2022 | ▮ | ▮ |
| 22 | June 30, 2022 | ▮ | ▮ |
| 23 | July 30, 2022 | ▮ | ▮ |
| 24 | Aug. 30, 2022 | ▮ | ▮ |
| 25 | Sept. 30, 2022 | ▮ | ▮ |
| 26 | Oct. 30, 2022 | ▮ | ▮ |
| 27 | Nov. 30, 2022 | ▮ | ▮ |
| 28 | Dec. 30, 2022 | ▮ | ▮ |
| 29 | Jan. 30, 2023 | ▮ | ▮ |
| 30 | Feb. 28, 2023 | ▮ | ▮ |
| 31 | March 30, 2023 | ▮ | ▮ |
| 32 | April 30, 2023 | ▮ | ▮ |
| 33 | May 30, 2023 | ▮ | ▮ |
| 34 | June 30, 2023 | ▮ | ▮ |
| 35 | July 30, 2023 | ▮ | ▮ |
| 36 | Aug. 30, 2023 | ▮ | ▮ |
| 37 | Sept. 30, 2023 | ▮ | ▮ |

## Exercise legend

Securities resulting from the exercise of this option grant will be subject to the following transfer restrictions.

THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

## Exercises

3 certificates have been created from the exercise of this option grant.
███ of the █████ options in ES-25 have been exercised.

| Certificate | Exercise | Approver | Cash paid | Payment method | |
|---|---|---|---|---|---|
| > CS-13<br>Dec. 10, 2020 | ████████ | Jonathan Karafin<br>Dec. 21, 2020 | ██████ | Transferred via ACH | Documents ⌄ |
| > CS-14<br>Dec. 28, 2020 | ██████ | Jonathan Karafin<br>Dec. 31, 2020 | ██████ | Transferred via ACH | Documents ⌄ |
| > CS-15<br>April 29, 2021 | ████████ | Jonathan Karafin<br>May 5, 2021 | ██████ | Transferred via ACH | Documents ⌄ |

### When exercising this option grant on Carta, the optionholder agreed to the following:

This option exercise is subject to all of the terms and conditions as set forth in the Equity Incentive Plan, Option Agreement and the Exercise Agreement documents available for download in connection with the applicable option grant. By entering your full name below, your signature will be applied to the Exercise Agreement document(s) and you acknowledge, understand and agree to all of the terms and conditions as set forth in the Exercise Agreement document(s). You further acknowledge that you are authorizing Carta to transfer up to ████████ for the total exercise price and tax withholdings, if applicable, from your bank account to Light Field Lab to effect the exercise of █████ shares for the grant ES-25 on Apr 29, 2021.

*Alan Jones*
_____
Alan Jones
*April 29, 2021*
_____
Date

### When exercising this option grant on Carta, the optionholder agreed to the following:

This option exercise is subject to all of the terms and conditions as set forth in the Equity Incentive Plan, Option Agreement and the Exercise Agreement documents available for download in connection with the applicable option grant. By entering your full name below, your signature will be applied to the Exercise Agreement document(s) and you acknowledge, understand and agree to all of the terms and conditions as set forth in the Exercise Agreement document(s). You further acknowledge that you are authorizing Carta to transfer up to ████████ for the total exercise price and tax withholdings, if applicable, from your bank account to Light Field Lab to effect the exercise of █████ shares for the grant ES-25 on Dec 28, 2020.

*Alan Jones*
_____
Alan Jones
*Dec. 28, 2020*
_____
Date

### When exercising this option grant on Carta, the optionholder agreed to the following:

This option exercise is subject to all of the terms and conditions as set forth in the Equity Incentive Plan, Option Agreement and the Exercise Agreement documents available for download in connection with the applicable option grant. By entering your full name below, your signature will be applied to the Exercise Agreement document(s) and you acknowledge, understand and agree to all of the terms and conditions as set forth in the Exercise Agreement document(s). You further acknowledge that you are authorizing Carta to transfer up to ████████ for the total exercise price and tax withholdings, if applicable, from your bank account to Light Field Lab to effect the exercise of █████ shares for the grant ES-25 on Dec 10, 2020.



*Alan Jones*

Alan Jones

*Dec. 10, 2020*

Date

---

### Approvals

✓   Initiated by Lisa Schlinkert
     Approved Dec. 18, 2019   🔒 58bd215074474ff295617b3f666f276c

✓   Signed by Jon Karafin
     Approved Jan. 2, 2020   🔒 c91287f02d5f47c2ae1f665c6caf9a98

✓   Received by Alan Jones
     Approved Jan. 2, 2020   🔒 070e696a351c444984c7b337dc918718

---

### Documents and notes

| Equity Incentive Plan | 🔗 Light Field Lab - 2017 Stock Incentive Plan.pdf |
|---|---|
| Form of Option Agreement | 🔗 Light Field Lab - Form of Option Agreement.pdf |
| Form of Exercise Agreement | 🔗 Light Field Lab - Form of Exercise Agreement.pdf |
| Notes | Exercised ███ shares to certificate CS-13 on 12/10/2020. |
| | Exercised ███ shares to certificate CS-14 on 12/28/2020. |
| | Exercised ███ shares to certificate CS-15 on 04/29/2021. |

**LIGHT FIELD LAB, INC.**

**2017 LIGHT FIELD LAB, INC. STOCK INCENTIVE PLAN**

    1.    **Purposes of the Plan.**  The purposes of this 2017 Light Field Lab, Inc. Stock Incentive Plan are to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees and Consultants, and to promote the success of the Company's business.  Options granted under the Plan may be Incentive Stock Options or Nonstatutory Stock Options, as determined by the Administrator at the time of grant of an Option and subject to the applicable provisions of Section 422 of the Code and the regulations promulgated thereunder.  Restricted Stock may also be granted under the Plan.

    2.    **Definitions.**  As used herein, the following definitions shall apply:

        (a)    **"Administrator"** means the Board or a Committee.

        (b)    **"Affiliate"** means (i) an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity and (ii) an entity other than a Subsidiary in which the Company and /or one or more Subsidiaries own a controlling interest.

        (c)    **"Applicable Laws"** means all applicable laws, rules, regulations and requirements, including, but not limited to, all applicable U.S. federal or state laws, any Stock Exchange rules or regulations, and the applicable laws, rules or regulations of any other country or jurisdiction where Options or Restricted Stock are granted under the Plan or Participants reside or provide services, as such laws, rules, and regulations shall be in effect from time to time.

        (d)    **"Award"** means any award of an Option or Restricted Stock under the Plan.

        (e)    **"Board"** means the Board of Directors of the Company.

        (f)    **"Cashless Exercise"** means a program approved by the Administrator in which payment of the Option exercise price or tax withholding obligations or other required deductions may be satisfied, in whole or in part, with Shares subject to the Option, including by delivery of an irrevocable direction to a securities broker (on a form prescribed by the Company) to sell Shares and to deliver all or part of the sale proceeds to the Company in payment of such amount.

        (g)    **"Cause"** for termination of a Participant's Continuous Service Status will exist (unless another definition is provided in an applicable Option Agreement, Restricted Stock Purchase Agreement, employment agreement or other applicable written agreement) if the Participant's Continuous Service Status is terminated for any of the following reasons: (i) any material breach by Participant of any material written agreement between Participant and the Company and Participant's failure to cure such breach within 30 days after receiving written notice thereof; (ii) any failure by Participant to comply with the Company's material written

policies or rules as they may be in effect from time to time; (iii) neglect or persistent unsatisfactory performance of Participant's duties and Participant's failure to cure such condition within 30 days after receiving written notice thereof; (iv) Participant's repeated failure to follow reasonable and lawful instructions from the Board or Chief Executive Officer and Participant's failure to cure such condition within 30 days after receiving written notice thereof; (v) Participant's conviction of, or plea of guilty or nolo contendere to, any crime that results in, or is reasonably expected to result in, material harm to the business or reputation of the Company; (vi) Participant's commission of or participation in an act of fraud against the Company; (vii) Participant's intentional material damage to the Company's business, property or reputation; or (viii) Participant's unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom the Participant owes an obligation of nondisclosure as a result of his or her relationship with the Company. For purposes of clarity, a termination without "Cause" does not include any termination that occurs as a result of Participant's death or disability. The determination as to whether a Participant's Continuous Service Status has been terminated for Cause shall be made in good faith by the Company and shall be final and binding on the Participant. The foregoing definition does not in any way limit the Company's ability to terminate a Participant's employment or consulting relationship at any time, and the term "Company" will be interpreted to include any Subsidiary, Parent, Affiliate, or any successor thereto, if appropriate.

(h)     **"Change of Control"** means (i) a sale of all or substantially all of the Company's assets other than to an Excluded Entity (as defined below), (ii) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, limited liability company or other entity other than an Excluded Entity, or (iii) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the Company's then outstanding voting securities.

Notwithstanding the foregoing, a transaction shall not constitute a Change of Control if its purpose is to (A) change the jurisdiction of the Company's incorporation, (B) create a holding company that will be owned in substantially the same proportions by the persons who hold the Company's securities immediately before such transaction, or (C) obtain funding for the Company in a financing that is approved by the Company's Board. An "Excluded Entity" means a corporation or other entity of which the holders of voting capital stock of the Company outstanding immediately prior to such transaction are the direct or indirect holders of voting securities representing at least a majority of the votes entitled to be cast by all of such corporation's or other entity's voting securities outstanding immediately after such transaction.

(i)     **"Code"** means the Internal Revenue Code of 1986, as amended.

(j)     **"Committee"** means one or more committees or subcommittees of the Board consisting of two (2) or more Directors (or such lesser or greater number of Directors as shall constitute the minimum number permitted by Applicable Laws to establish a committee or sub-committee of the Board) appointed by the Board to administer the Plan in accordance with Section 4 below.

2

(k)    **Common Stock**" means the Company's common stock, par value $0.0001 per share, as adjusted pursuant to Section 10 below.

(l)    **Company**" means Light Field Lab, Inc., a Delaware corporation.

(m)    **Consultant**" means any person or entity, including an advisor but not an Employee, that renders, or has rendered, services to the Company, or any Parent, Subsidiary or Affiliate and is compensated for such services, and any Director whether compensated for such services or not.

(n)    **Continuous Service Status**" means the absence of any interruption or termination of service as an Employee or Consultant. Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of: (i) Company approved sick leave; (ii) military leave; (iii) any other bona fide leave of absence approved by the Company, provided that, if an Employee is holding an Incentive Stock Option and such leave exceeds 3 months then, for purposes of Incentive Stock Option status only, such Employee's service as an Employee shall be deemed terminated on the 1st day following such 3-month period and the Incentive Stock Option shall thereafter automatically become a Nonstatutory Stock Option in accordance with Applicable Laws, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to a written Company policy. Also, Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of a transfer between locations of the Company or between the Company, its Parents, Subsidiaries or Affiliates, or their respective successors, or a change in status from an Employee to a Consultant or from a Consultant to an Employee.

(o)    **Director**" means a member of the Board.

(p)    **Disability**" means "disability" within the meaning of Section 22(e)(3) of the Code.

(q)    **Employee**" means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Company in its sole discretion, subject to any requirements of Applicable Laws, including the Code. The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(r)    **Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(s)    **Fair Market Value**" means, as of any date, the per share fair market value of the Common Stock, as determined by the Administrator in compliance with Section 409A of the Code, or in the case of an Incentive Stock Option, in compliance with Section 422 of the Code.

(t)    **Family Members**" means any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law (including adoptive

3

relationships) of the Participant, any person sharing the Participant's household (other than a tenant or employee), a trust in which these persons (or the Participant) have more than 50% of the beneficial interest, a foundation in which these persons (or the Participant) control the management of assets, and any other entity in which these persons (or the Participant) own more than 50% of the voting interests.

(u)    **"Incentive Stock Option"** means an Option intended to, and which does, in fact, qualify as an incentive stock option within the meaning of Section 422 of the Code.

(v)    **"Involuntary Termination"** means (unless another definition is provided in the applicable Option Agreement, Restricted Stock Purchase Agreement, employment agreement or other applicable written agreement) the termination of a Participant's Continuous Service Status other than for (i) death, (ii) Disability or (iii) for Cause by the Company or a Parent, Subsidiary, Affiliate or successor thereto, as appropriate.

(w)    "**Listed Security**" means any security of the Company that is listed or approved for listing on a national securities exchange or designated or approved for designation as a national market system security on an interdealer quotation system by the Financial Industry Regulatory Authority (or any successor thereto).

(x)    **"Nonstatutory Stock Option"** means an Option that is not intended to, or does not, in fact, qualify as an Incentive Stock Option.

(y)    **"Option"** means a stock option granted pursuant to the Plan.

(z)    **"Option Agreement"** means a written document, the form(s) of which shall be approved from time to time by the Administrator, reflecting the terms of an Option granted under the Plan and includes any documents attached to or incorporated into such Option Agreement, including, but not limited to, a notice of stock option grant and a form of exercise notice.

(aa)    **"Option Exchange Program"** means a program approved by the Administrator whereby outstanding Options (i) are exchanged for Options with a lower exercise price, Restricted Stock, cash or other property or (ii) are amended to decrease the exercise price as a result of a decline in the Fair Market Value.

(bb)    **"Optioned Stock"** means Shares that are subject to an Option or that were issued pursuant to the exercise of an Option.

(cc)    **"Optionee"** means an Employee or Consultant who receives an Option.

(dd)    **"Parent"** means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if, at the time of grant of the Award, each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be considered a Parent commencing as of such date.

4

(ee)    **"Participant"** means any holder of one or more Awards or Shares issued pursuant to an Award.

(ff)    **"Plan"** means this 2017 Light Field Lab, Inc. Stock Incentive Plan.

(gg)    **"Restricted Stock"** means Shares acquired pursuant to a right to purchase or receive Common Stock granted pursuant to Section 8 below.

(hh)    **"Restricted Stock Purchase Agreement"** means a written document, the form(s) of which shall be approved from time to time by the Administrator, reflecting the terms of Restricted Stock granted under the Plan and includes any documents attached to such agreement.

(ii)    "**Rule 405**" means Rule 405 promulgated under the Securities Act.

(jj)    "**Rule 701**" means Rule 701 promulgated under the Securities Act.

(kk)    **"Rule 16b-3"** means Rule 16b-3 promulgated under the Exchange Act, as amended from time to time, or any successor provision.

(ll)    "**Securities Act**" means the Securities Act of 1933, as amended.

(mm)    **"Share"** means a share of Common Stock, as adjusted in accordance with Section 10 below.

(nn)    **"Stock Exchange"** means any stock exchange or consolidated stock price reporting system on which prices for the Common Stock are quoted at any given time.

(oo)    **"Subsidiary"** means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if, at the time of grant of the Award, each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

(pp)    **"Ten Percent Holder"** means a person who owns stock representing more than 10% of the voting power of all classes of stock of the Company or any Parent or Subsidiary measured as of an Award's date of grant.

3.    **Stock Subject to the Plan.** Subject to the provisions of Section 10 below, the maximum aggregate number of Shares that may be issued under the Plan is ▇▇▇▇▇ Shares, all of which Shares may be issued under the Plan pursuant to Incentive Stock Options. The Shares issued under the Plan may be authorized, but unissued, or reacquired Shares. If an Award should expire or become unexercisable for any reason without having been exercised in full, or is surrendered pursuant to an Option Exchange Program, the unissued Shares that were subject thereto shall, unless the Plan shall have been terminated, continue to be available under the Plan for issuance pursuant to future Awards. In addition, any Shares which are retained by the Company upon exercise of an Award in order to satisfy the exercise or purchase price for such

5

Award or any withholding taxes due with respect to such Award shall be treated as not issued and shall continue to be available under the Plan for issuance pursuant to future Awards. Shares issued under the Plan and later forfeited to the Company due to the failure to vest or repurchased by the Company at the original purchase price paid to the Company for the Shares (including, without limitation, upon forfeiture to or repurchase by the Company in connection with the termination of a Participant's Continuous Service Status) shall again be available for future grant under the Plan. Notwithstanding the foregoing, subject to the provisions of Section 10 below, in no event shall the maximum aggregate number of Shares that may be issued under the Plan pursuant to Incentive Stock Options exceed the number set forth in the first sentence of this Section 3 plus, to the extent allowable under Section 422 of the Code and the Treasury Regulations promulgated there under, any Shares that again become available for issuance pursuant to the remaining provisions of this Section 3.

4.    **Administration of the Plan.**

(a)    **General.**    The Plan shall be administered by the Board, a Committee appointed by the Board, or any combination thereof, as determined by the Board. The Plan may be administered by different administrative bodies with respect to different classes of Participants and, if permitted by Applicable Laws, the Board may authorize one or more officers of the Company to make Awards under the Plan to Employees and Consultants (who are not subject to Section 16 of the Exchange Act) within parameters specified by the Board.

(b)    **Committee Composition.**    If a Committee has been appointed pursuant to this Section 4, such Committee shall continue to serve in its designated capacity until otherwise directed by the Board. From time to time the Board may increase the size of any Committee and appoint additional members thereof, remove members (with or without cause) and appoint new members in substitution therefor, fill vacancies (however caused) and dissolve a Committee and thereafter directly administer the Plan, all to the extent permitted by Applicable Laws and, in the case of a Committee administering the Plan in accordance with the requirements of Rule 16b-3 or Section 162(m) of the Code, to the extent permitted or required by such provisions.

(c)    **Powers of the Administrator.**    Subject to the provisions of the Plan and, in the case of a Committee, the specific duties delegated by the Board to such Committee, the Administrator shall have the authority, in its sole discretion:

(i)    to determine the Fair Market Value in accordance with Section 2(s) above;

(ii)    to determine to whom Awards may from time to time be granted;

(iii)    to determine the number of Shares to be covered by each Award;

(iv)    to approve the form(s) of agreement(s) and other related documents used under the Plan;

(v)    to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder, which terms and conditions include but are not limited to the exercise or purchase price, the number of shares of Common Stock subject to,

6

or the cash value of, an Award, the time or times when Awards may vest and/or be exercised (which may be based on performance criteria), the circumstances (if any) when vesting will be accelerated or forfeiture restrictions will be waived, and any restriction or limitation regarding any Award, Optioned Stock, or Restricted Stock;

(vi)    to amend any outstanding Award or agreement related to any Optioned Stock or Restricted Stock, including any amendment adjusting vesting (e.g., in connection with a change in the terms or conditions under which such person is providing services to the Company), provided that no amendment shall be made that would materially and adversely affect the rights of any Participant without his or her consent unless the Company requests the consent of the affected Participant, and such Participant consents in writing. Notwithstanding the foregoing, (1) a Participant's rights will not be deemed to have been impaired by any such amendment if the Board, in its sole discretion, determines that the amendment, taken as a whole, does not materially impair the Participant's rights, and (2) subject to the limitations of applicable law, if any, the Board may amend the terms of any one or more Stock Awards without the affected Participant's consent (A) to maintain the qualified status of the Stock Award as an Incentive Stock Option under Section 422 of the Code; (B) to change the terms of an Incentive Stock Option, if such change results in impairment of the Stock Award solely because it impairs the qualified status of the Stock Award as an Incentive Stock Option under Section 422 of the Code; (C) to clarify the manner of exemption from, or to bring the Stock Award into compliance with, Section 409A of the Code; or (D) to comply with other applicable laws;

(vii)    to determine whether and under what circumstances an Option may be settled in cash under Section 7(c)(iii) below instead of Common Stock;

(viii)    subject to Applicable Laws, to implement an Option Exchange Program and establish the terms and conditions of such Option Exchange Program without consent of the holders of capital stock of the Company, provided that no amendment or adjustment to an Option that would materially and adversely affect the rights of any Participant shall be made without his or her consent;

(ix)    to amend the Plan in any respect the Board deems necessary or advisable, including, without limitation, by adopting amendments relating to Incentive Stock Options and certain nonqualified deferred compensation under Section 409A of the Code and/or bringing the Plan or Awards granted under the Plan into compliance with the requirements for Incentive Stock Options or ensuring that they are exempt from, or compliant with, the requirements for nonqualified deferred compensation under Section 409A of the Code, subject to the limitations, if any, of applicable law. If required by applicable law or listing requirements, and except as provided in Section 10(a), the Company will seek stockholder approval of any amendment of the Plan that (A) materially increases the number of shares of Common Stock available for issuance under the Plan, (B) materially expands the class of individuals eligible to receive Stock Awards under the Plan, (C) materially increases the benefits accruing to Participants under the Plan, (D) materially reduces the price at which shares of Common Stock may be issued or purchased under the Plan, (E) materially extends the term of the Plan, or (F) materially expands the types of Stock Awards available for issuance under the Plan. Except as otherwise provided in the Plan or a Stock Award Agreement, no amendment of the Plan will

7

materially impair a Participant's rights under an outstanding Stock Award without the Participant's written consent.

(x)    to (A) adopt such procedures and sub-plans as are necessary or appropriate or (B) approve addenda pursuant to Section 19 below or to grant Awards to, or to modify the terms of, any outstanding Option Agreement or Restricted Stock Purchase Agreement or any agreement related to any Optioned Stock or Restricted Stock held by Participants who are foreign nationals or employed outside of the United States with such terms and conditions as the Administrator deems necessary or appropriate to accommodate differences in local law, tax policy or custom which deviate from the terms and conditions set forth in this Plan to the extent necessary or appropriate to accommodate such differences; and

(xi)    to effect, with the consent of any adversely affected Participant, (A) the reduction of the exercise, purchase or strike price of any outstanding Award; (B) the cancellation of any outstanding Award and the grant in substitution therefor of a new (1) Option, (2) Restricted Stock Award, (3) cash and/or (6) other valuable consideration determined by the Board, in its sole discretion, with any such substituted award (x) covering the same or a different number of shares of Common Stock as the cancelled Stock Award and (y) granted under the Plan or another equity or compensatory plan of the Company; or (C) any other action that is treated as a repricing under generally accepted accounting principles

(xii)    to construe and interpret the terms of the Plan, any Option Agreement or Restricted Stock Purchase Agreement, and any agreement related to any Optioned Stock or Restricted Stock, which constructions, interpretations and decisions shall be final and binding on all Participants.

(d)    **Indemnification.** To the maximum extent permitted by Applicable Laws, each member of the Committee (including officers of the Company, if applicable), or of the Board, as applicable, shall be indemnified and held harmless by the Company against and from (i) any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by him or her in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action taken or failure to act under the Plan or pursuant to the terms and conditions of any Award except for actions taken in bad faith or failures to act in good faith, and (ii) any and all amounts paid by him or her in settlement thereof, with the Company's approval, or paid by him or her in satisfaction of any judgment in any such claim, action, suit, or proceeding against him or her, provided that such member shall give the Company an opportunity, at its own expense, to handle and defend any such claim, action, suit or proceeding before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled under the Company's Certificate of Incorporation or Bylaws, by contract, as a matter of law, or otherwise, or under any other power that the Company may have to indemnify or hold harmless each such person.

5.    **Eligibility.**

(a)    **Recipients of Grants.** Nonstatutory Stock Options and Restricted Stock may be granted to Employees and Consultants. Incentive Stock Options may be granted only to

8

Employees or a Employees of a "parent corporation" or "subsidiary corporation" thereof (as such terms are defined in Sections 424(e) and 424(f) of the Code). Awards other than Incentive Stock Options may be granted to Employees, Directors and Consultants; provided, however, that Awards may not be granted to Employees, Directors and Consultants who are providing Continuous Service only to any "parent" of the Company, as such term is defined in Rule 405, unless (i) the stock underlying such Awards is treated as "service recipient stock" under Section 409A of the Code (for example, because the Awards are granted pursuant to a corporate transaction such as a spin off transaction), (ii) the Company, in consultation with its legal counsel, has determined that such Awards are otherwise exempt from Section 409A of the Code, or (iii) the Company, in consultation with its legal counsel, has determined that such Awards comply with the distribution requirements of Section 409A of the Code.

      (b)   **Type of Option.**  Each Option shall be designated in the Option Agreement as either an Incentive Stock Option or a Nonstatutory Stock Option.

      (c)   **ISO $100,000 Limitation.**  Notwithstanding any designation under Section 5(b) above, to the extent that the aggregate Fair Market Value of Shares with respect to which options designated as incentive stock options are exercisable for the first time by any Optionee during any calendar year (under all plans of the Company or any Parent or Subsidiary) exceeds $100,000, such excess options shall be treated as Nonstatutory Stock Options. For purposes of this Section 5(c), Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the Shares subject to an Incentive Stock Option shall be determined as of the date of the grant of such Option.

      (d)   **Consultants**.  A Consultant will not be eligible for the grant of an Award if, at the time of grant, either the offer or sale of the Company's securities to such Consultant is not exempt under Rule 701 because of the nature of the services that the Consultant is providing to the Company, because the Consultant is not a natural person, or because of any other provision of Rule 701, unless the Company determines that such grant need not comply with the requirements of Rule 701 and will satisfy another exemption under the Securities Act as well as comply with the securities laws of all other relevant jurisdictions.

      (e)   **No Employment Rights.**  Neither the Plan nor any Award shall confer upon any Employee or Consultant any right with respect to continuation of an employment or consulting relationship with the Company (any Parent, Subsidiary or Affiliate), nor shall it interfere in any way with such Employee's or Consultant's right or the Company's (Parent's, Subsidiary's or Affiliate's) right to terminate his or her employment or consulting relationship at any time, with or without cause.

    6.   **Term of Plan.**  The Plan shall become effective upon its adoption by the Board and shall continue in effect for a term of 10 years unless sooner terminated under Section 14 below.

    7.   **Options.**

      (a)   **Term of Option.**  The term of each Option shall be the term stated in the Option Agreement; provided that the term shall be no more than 10 years from the date of grant

9

thereof or such shorter term as may be provided in the Option Agreement and provided further that, in the case of an Incentive Stock Option granted to a person who at the time of such grant is a Ten Percent Holder, the term of the Option shall be 5 years from the date of grant thereof or such shorter term as may be provided in the Option Agreement.

(b) **Option Exercise Price and Consideration.**

(i) **Exercise Price.** The per Share exercise price for the Shares to be issued pursuant to the exercise of an Option shall be such price as is determined by the Administrator and set forth in the Option Agreement, but shall be subject to the following:

(1) In the case of an Incentive Stock Option

a. granted to an Employee who at the time of grant is a Ten Percent Holder, the per Share exercise price shall be no less than 110% of the Fair Market Value on the date of grant;

b. granted to any other Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value on the date of grant;

(2) Except as provided in subsection (3) below, in the case of a Nonstatutory Stock Option the per Share exercise price shall be such price as is determined by the Administrator, provided that, if the per Share exercise price is less than 100% of the Fair Market Value on the date of grant, it shall otherwise comply with all Applicable Laws, including Section 409A of the Code; and

(3) Notwithstanding the foregoing, Options may be granted with a per Share exercise price other than as required above pursuant to a merger or other corporate transaction.

(ii) **Permissible Consideration.** The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall be determined by the Administrator (and, in the case of an Incentive Stock Option and to the extent required by Applicable Laws, shall be determined at the time of grant) and may consist entirely of (1) cash; (2) check; (3) to the extent permitted under, and in accordance with, Applicable Laws, delivery of a promissory note with such recourse, interest, security and redemption provisions as the Administrator determines to be appropriate (subject to the provisions of Section 152 of the Delaware General Corporation Law); (4) cancellation of indebtedness; (5) other previously owned Shares that have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which the Option is exercised; (6) a Cashless Exercise; (7) such other consideration and method of payment permitted under Applicable Laws; or (8) any combination of the foregoing methods of payment. In addition to the foregoing, if an Option is a Nonstatutory Stock Option, consideration may be paid, in the determination of the Administrator in its sole discretion, by a "net exercise" arrangement pursuant to which the Company will reduce the number of shares of Common Stock issuable upon exercise by the largest whole number of shares with a Fair Market Value that does not exceed the aggregate exercise price; provided, however, that the Company will accept a cash or other payment from the Participant to the extent of any remaining balance of the aggregate exercise price not satisfied

10

by such reduction in the number of whole shares to be issued. Shares of Common Stock will no longer be subject to an Option and will not be exercisable thereafter to the extent that (A) shares issuable upon exercise are used to pay the exercise price pursuant to the "net exercise," (B) shares are delivered to the Participant as a result of such exercise, and (C) shares are withheld to satisfy tax withholding obligations. In making its determination as to the type of consideration to accept, the Administrator shall consider if acceptance of such consideration may be reasonably expected to benefit the Company and the Administrator may, in its sole discretion, refuse to accept a particular form of consideration at the time of any Option exercise.

(c)    **Exercise of Option.**

(i)    **General.**

(1)    **Exercisability.**  Any Option granted hereunder shall be exercisable at such times and under such conditions as determined by the Administrator, consistent with the terms of the Plan and reflected in the Option Agreement, including vesting requirements and/or performance criteria with respect to the Company, and Parent, Subsidiary or Affiliate, and/or the Optionee.

(2)    **Leave of Absence.**  The Administrator shall have the discretion to determine at any time whether and to what extent the vesting of Options shall be tolled during any leave of absence; provided, however, that in the absence of such determination, vesting of Options shall continue during any paid leave and shall be tolled during any unpaid leave (unless otherwise required by Applicable Laws).  Notwithstanding the foregoing, in the event of military leave, vesting shall toll during any unpaid portion of such leave, provided that, upon an Optionee's returning from military leave (under conditions that would entitle him or her to protection upon such return under the Uniform Services Employment and Reemployment Rights Act), he or she shall be given vesting credit with respect to Options to the same extent as would have applied had the Optionee continued to provide services to the Company (or any Parent, Subsidiary or Affiliate, if applicable) throughout the leave on the same terms as he or she was providing services immediately prior to such leave.

(3)    **Minimum Exercise Requirements.**  An Option may not be exercised for a fraction of a Share.  The Administrator may require that an Option be exercised as to a minimum number of Shares, provided that such requirement shall not prevent an Optionee from exercising the full number of Shares as to which the Option is then exercisable.

(4)    **Procedures for and Results of Exercise.**  An Option shall be deemed exercised when written notice of such exercise has been received by the Company in accordance with the terms of the Option Agreement by the person entitled to exercise the Option and the Company has received full payment for the Shares with respect to which the Option is exercised and has paid, or made arrangements to satisfy, any applicable taxes, withholding, required deductions or other required payments in accordance with Section 9 below.  The exercise of an Option shall result in a decrease in the number of Shares that thereafter may be available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

11

       (5)    **Rights as Holder of Capital Stock.**  Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a holder of capital stock shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option.  No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock is issued, except as provided in Section 10 below.

       (ii)    **Termination of Continuous Service Status.**  The Administrator shall establish and set forth in the applicable Option Agreement the terms and conditions upon which an Option shall remain exercisable, if at all, following termination of an Optionee's Continuous Service Status, which provisions may be waived or modified by the Administrator at any time.  To the extent that an Option Agreement does not specify the terms and conditions upon which an Option shall terminate upon termination of an Optionee's Continuous Service Status, the following provisions shall apply:

       (1)    **General Provisions.**  If the Optionee (or other person entitled to exercise the Option) does not exercise the Option to the extent so entitled within the time specified below, the Option shall terminate and the Optioned Stock underlying the unexercised portion of the Option shall revert to the Plan.  In no event may any Option be exercised after the expiration of the Option term as set forth in the Option Agreement (and subject to this Section 7).

       (2)    **Termination other than Upon Disability or Death or for Cause.**  In the event of termination of an Optionee's Continuous Service Status other than under the circumstances set forth in the subsections (3) through (5) below, such Optionee may exercise any outstanding Option at any time within 3 month(s) following such termination to the extent the Optionee is vested in the Optioned Stock.

       (3)    **Disability of Optionee.**  In the event of termination of an Optionee's Continuous Service Status as a result of his or her Disability, such Optionee may exercise any outstanding Option at any time within 12 month(s) following such termination to the extent the Optionee is vested in the Optioned Stock.

       (4)    **Death of Optionee.**  In the event of the death of an Optionee during the period of Continuous Service Status since the date of grant of any outstanding Option, or within 3 month(s) following termination of the Optionee's Continuous Service Status, the Option may be exercised by any beneficiaries designated in accordance with Section 17 below, or if there are no such beneficiaries, by the Optionee's estate, or by a person who acquired the right to exercise the Option by bequest or inheritance, at any time within 18 month(s) following the date the Optionee's Continuous Service Status terminated, but only to the extent the Optionee is vested in the Optioned Stock.

       (5)    **Termination for Cause.**  In the event of termination of an Optionee's Continuous Service Status for Cause, any outstanding Option (including any vested portion thereof) held by such Optionee shall immediately terminate in its entirety upon first notification to the Optionee of termination of the Optionee's Continuous Service Status for Cause.  If an Optionee's Continuous Service Status is suspended pending an investigation of

12

whether the Optionee's Continuous Service Status will be terminated for Cause, all the Optionee's rights under any Option, including the right to exercise the Option, shall be suspended during the investigation period. Nothing in this Section 7(c)(ii)(5) shall in any way limit the Company's right to purchase unvested Shares issued upon exercise of an Option as set forth in the applicable Option Agreement.

(iii)  **Buyout Provisions.**  The Administrator may at any time offer to buy out for a payment in cash or Shares an Option previously granted under the Plan based on such terms and conditions as the Administrator shall establish and communicate to the Optionee at the time that such offer is made.

8.  **Restricted Stock.**

(a)  **Rights to Purchase.**  When a right to purchase or receive Restricted Stock is granted under the Plan, the Company shall advise the recipient in writing of the terms, conditions and restrictions related to the offer, including the number of Shares that such person shall be entitled to purchase, the price to be paid, if any (which shall be as determined by the Administrator, subject to Applicable Laws, including any applicable securities laws), and the time within which such person must accept such offer.  The permissible consideration for Restricted Stock shall be determined by the Administrator and shall be the same as is set forth in Section 7(b)(ii) above with respect to exercise of Options.  The offer to purchase Shares shall be accepted by execution of a Restricted Stock Purchase Agreement in the form determined by the Administrator.

(b)  **Repurchase Option.**

(i)  **General.**  Unless the Administrator determines otherwise, the Restricted Stock Purchase Agreement shall grant the Company a repurchase option exercisable upon the voluntary or involuntary termination of the Participant's Continuous Service Status for any reason (including death or Disability) at a purchase price for Shares equal to the original purchase price paid by the purchaser to the Company for such Shares and may be paid by cancellation of any indebtedness of the purchaser to the Company.  The repurchase option shall lapse at such rate as the Administrator may determine.

(ii)  **Leave of Absence.**  The Administrator shall have the discretion to determine at any time whether and to what extent the lapsing of Company repurchase rights shall be tolled during any leave of absence; provided, however, that in the absence of such determination, such lapsing shall continue during any paid leave and shall be tolled during any unpaid leave (unless otherwise required by Applicable Laws).  Notwithstanding the foregoing, in the event of military leave, the lapsing of Company repurchase rights shall toll during any unpaid portion of such leave, provided that, upon a Participant's returning from military leave (under conditions that would entitle him or her to protection upon such return under the Uniform Services Employment and Reemployment Rights Act), he or she shall be given vesting credit with respect to Shares purchased pursuant to the Restricted Stock Purchase Agreement to the same extent as would have applied had the Participant continued to provide services to the Company (or any Parent, Subsidiary or Affiliate, if applicable) throughout the leave on the same terms as he or she was providing services immediately prior to such leave.

13

(c) **Other Provisions.** The Restricted Stock Purchase Agreement shall contain such other terms, provisions and conditions not inconsistent with the Plan as may be determined by the Administrator in its sole discretion. In addition, the provisions of Restricted Stock Purchase Agreements need not be the same with respect to each Participant.

(d) **Rights as a Holder of Capital Stock.** Once the Restricted Stock is purchased, the Participant shall have the rights equivalent to those of a holder of capital stock, and shall be a record holder when his or her purchase and the issuance of the Shares is entered upon the records of the duly authorized transfer agent of the Company. No adjustment will be made for a dividend or other right for which the record date is prior to the date the Restricted Stock is purchased, except as provided in Section 10 below.

9. **Taxes.**

(a) As a condition of the grant, vesting and exercise of an Award, the Participant (or in the case of the Participant's death or a permitted transferee, the person holding or exercising the Award) shall make such arrangements as the Administrator may require for the satisfaction of any applicable U.S. federal, state, local or foreign tax, withholding, and any other required deductions or payments that may arise in connection with such Award. The Company shall not be required to issue any Shares under the Plan until such obligations are satisfied.

(b) The Administrator may, to the extent permitted under Applicable Laws, permit a Participant (or in the case of the Participant's death or a permitted transferee, the person holding or exercising the Award) to satisfy all or part of his or her tax, withholding, or any other required deductions or payments by Cashless Exercise or by surrendering Shares (either directly or by stock attestation) that he or she previously acquired; provided that, unless specifically permitted by the Company, any such Cashless Exercise must be an approved broker-assisted Cashless Exercise or the Shares withheld in the Cashless Exercise must be limited to avoid financial accounting charges under applicable accounting guidance and any such surrendered Shares must have been previously held for any minimum duration required to avoid financial accounting charges under applicable accounting guidance. Any payment of taxes by surrendering Shares to the Company may be subject to restrictions, including, but not limited to, any restrictions required by rules of the Securities and Exchange Commission.

10. **Adjustments Upon Changes in Capitalization, Merger or Certain Other Transactions.**

(a) **Changes in Capitalization.** Subject to any action required under Applicable Laws by the holders of capital stock of the Company, (i) the numbers and class of Shares or other stock or securities: (x) available for future Awards under Section 3 above and (y) covered by each outstanding Award, (ii) the exercise price per Share of each such outstanding Option, and (iii) any repurchase price per Share applicable to Shares issued pursuant to any Award, shall be automatically proportionately adjusted in the event of a stock split, reverse stock split, stock dividend, combination, consolidation, reclassification of the Shares or subdivision of the Shares. In the event of any increase or decrease in the number of issued Shares effected without receipt of consideration by the Company, a declaration of an extraordinary dividend with respect to the Shares payable in a form other than Shares in an amount that has a material effect

14

on the Fair Market Value, a recapitalization (including a recapitalization through a large nonrecurring cash dividend), a rights offering, a reorganization, merger, a spin-off, split-up, change in corporate structure or a similar occurrence, the Administrator shall make appropriate adjustments, in its discretion, in one or more of (i) the numbers and class of Shares or other stock or securities: (x) available for future Awards under Section 3 above and (y) covered by each outstanding Award, (ii) the exercise price per Share of each outstanding Option and (iii) any repurchase price per Share applicable to Shares issued pursuant to any Award, and any such adjustment by the Administrator shall be made in the Administrator's sole and absolute discretion and shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Award. If, by reason of a transaction described in this Section 10(a) or an adjustment pursuant to this Section 10(a), a Participant's Award agreement or agreement related to any Optioned Stock or Restricted Stock covers additional or different shares of stock or securities, then such additional or different shares, and the Award agreement or agreement related to the Optioned Stock or Restricted Stock in respect thereof, shall be subject to all of the terms, conditions and restrictions which were applicable to the Award, Optioned Stock and Restricted Stock prior to such adjustment.

(b)    **Dissolution or Liquidation.**  In the event of the dissolution or liquidation of the Company, each Award will terminate immediately prior to the consummation of such action, unless otherwise determined by the Administrator.

(c)    **Corporate Transactions.**  In the event of (i) a sale or disposition of all or substantially all of the Company's assets, (ii) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, entity or person, (iii) a merger, consolidation or similar transaction following which the Company is the surviving corporation but the shares of Common Stock outstanding immediately preceding the merger, consolidation or similar transaction are converted or exchanged by virtue of the merger, consolidation or similar transaction into other property, whether in the form of securities, cash or otherwise, or (iv) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the Company's then outstanding capital stock (a "Corporate Transaction"), each outstanding Award (vested or unvested) will be treated as the Administrator determines, which determination may be made without the consent of any Participant and need not treat all outstanding Awards (or portion thereof) in an identical manner.  Such determination, without the consent of any Participant, may provide (without limitation) for one or more of the following in the event of a Corporate Transaction:  (A) the continuation of such outstanding Awards by the Company (if the Company is the surviving corporation); (B) the assumption of such outstanding Awards by the surviving corporation or its parent; (C) the substitution by the surviving corporation or its parent of new options or equity awards for such Awards; (D) the cancellation of such Awards in exchange for a payment to the Participants equal to the excess of (1) the Fair Market Value of the Shares subject to such Awards as of the closing date of such Corporate Transaction over (2) the exercise price or purchase price paid or to be paid for the Shares subject to the Awards; or (E) the cancellation of any outstanding Options or an outstanding right to purchase Restricted Stock, in either case, for

15

no consideration.

11.    **Change of Control**.  An Award may be subject to additional acceleration of vesting and exercisability upon or after a Change of Control as may be provided in the Option Agreement or Restricted Stock Purchase Agreement for such Award or as may be provided in any other written agreement between the Company or any Affiliate and the Participant, but in the absence of such provision, no such acceleration will occur.

12.    **Non-Transferability of Awards.**

(a)    **General.**  Except as set forth in this Section 11, Awards (or any rights of such Awards) may not be sold, pledged, encumbered, assigned, hypothecated, or disposed of or otherwise transferred in any manner other than by will or by the laws of descent or distribution. The designation of a beneficiary by a Participant will not constitute a transfer.  An Option may be exercised, during the lifetime of the holder of the Option, only by such holder or a transferee permitted by this Section 12.

(b)    **Limited Transferability Rights.**  Notwithstanding anything else in this Section 11, the Administrator may in its sole discretion provide that any Nonstatutory Stock Options may be transferred by instrument to an inter vivos or testamentary trust in which the Options are to be passed to beneficiaries upon the death of the trustor (settlor) or by gift to Family Members.  Further, beginning with (i) the period when the Company begins to rely on the exemption described in Rule 12h-1(f)(1) promulgated under the Exchange Act, as determined by the Board in its sole discretion, and (ii) ending on the earlier of (A) the date when the Company ceases to rely on such exemption, as determined by the Board in its sole discretion, or (B) the date when the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, an Option, or prior to exercise, the Shares subject to the Option, may not be pledged, hypothecated or otherwise transferred or disposed of, in any manner, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than to (i) persons who are Family Members through gifts or domestic relations orders, or (ii) to an executor or guardian of the Participant upon the death or disability of the Participant. Notwithstanding the foregoing sentence, the Board, in its sole discretion, may permit transfers of Nonstatutory Stock Options to the Company or in connection with a Change of Control or other acquisition transactions involving the Company to the extent permitted by Rule 12h-1(f).

13.    **Time of Granting Awards.**  The date of grant of an Award shall, for all purposes, be the date on which the Administrator makes the determination granting such Award, or such other date as is determined by the Administrator.

14.    **Miscellaneous.**

(a)    **Use of Proceeds from Sales of Common Stock**.  Proceeds from the sale of shares of Common Stock pursuant to Awards will constitute general funds of the Company.

(b)    **Corporate Action Constituting Grant of Awards**.  Corporate action constituting a grant by the Company of an Award to any Participant will be deemed completed as of the date of such corporate action, unless otherwise determined by the Board, regardless of

16

when the instrument, certificate, or letter evidencing the Award is communicated to, or actually received or accepted by, the Participant. In the event that the corporate records (e.g., Board consents, resolutions or minutes) documenting the corporate action constituting the grant contain terms (e.g., exercise price, vesting schedule or number of shares) that are inconsistent with those in the Option Agreement, Restricted Stock Purchase Agreement or related grant documents as a result of a clerical error in the papering of the Option Agreement, Restricted Stock Purchase Agreement or related grant documents, the corporate records will control and the Participant will have no legally binding right to the incorrect term in the Option Agreement, Restricted Stock Purchase Agreement or related grant documents.

(c)  **Stockholder Rights**. No Participant will be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Common Stock subject to an Award unless and until (i) such Participant has satisfied all requirements for exercise of, or the issuance of shares of Common Stock under, the Award pursuant to its terms, and (ii) the issuance of the Common Stock subject to the Award has been entered into the books and records of the Company.

(d)  **Change in Time Commitment**. In the event a Participant's regular level of time commitment in the performance of his or her services for the Company and any Affiliates is reduced (for example, and without limitation, if the Participant is an Employee of the Company and the Employee has a change in status from a full-time Employee to a part-time Employee or takes an extended leave of absence) after the date of grant of any Award to the Participant, the Board has the right in its sole discretion to (x) make a corresponding reduction in the number of shares subject to any portion of such Award that is scheduled to vest or become payable after the date of such change in time commitment, and (y) in lieu of or in combination with such a reduction, extend the vesting or payment schedule applicable to such Stock Award. In the event of any such reduction, the Participant will have no right with respect to any portion of the Award that is so reduced or extended.

(e)  **Investment Assurances**. The Company may require a Participant, as a condition of exercising or acquiring Common Stock under any Award, (i) to give written assurances satisfactory to the Company as to the Participant's knowledge and experience in financial and business matters and/or to employ a purchaser representative reasonably satisfactory to the Company who is knowledgeable and experienced in financial and business matters and that the Participant is capable of evaluating, alone or together with the purchaser representative, the merits and risks of exercising the Award; and (ii) to give written assurances satisfactory to the Company stating that the Participant is acquiring Common Stock subject to the Award for the Participant's own account and not with any present intention of selling or otherwise distributing the Common Stock. The foregoing requirements, and any assurances given pursuant to such requirements, will be inoperative if (A) the issuance of the shares upon the exercise or acquisition of Common Stock under the Award has been registered under a then currently effective registration statement under the Securities Act, or (B) as to any particular requirement, a determination is made by counsel for the Company that such requirement need not be met in the circumstances under the then applicable securities laws. The Company may, upon advice of counsel to the Company, place legends on stock certificates issued under the Plan as such counsel deems necessary or appropriate in order to comply with applicable securities laws, including, but not limited to, legends restricting the transfer of the Common Stock.

17

(f)      **Withholding Obligations**.  Unless prohibited by the terms of an Option Agreement or Restricted Stock Purchase Agreement, the Company may, in its sole discretion, satisfy any federal, state or local tax withholding obligation relating to an Award by any of the following means or by a combination of such means: (i) causing the Participant to tender a cash payment; (ii) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to the Participant in connection with the Award; *provided, however*, that no shares of Common Stock are withheld with a value exceeding the minimum amount of tax required to be withheld by law (or such lesser amount as may be necessary to avoid classification of the Award as a liability for financial accounting purposes); (iii) withholding cash from an Award settled in cash; (iv) withholding payment from any amounts otherwise payable to the Participant; or (v) by such other method as may be set forth in the Option Agreement or Restricted Stock Purchase Agreement.

(g)      **Electronic Delivery**.  Any reference herein to a "written" agreement or document will include any agreement or document delivered electronically or posted on the Company's intranet (or other shared electronic medium controlled by the Company to which the Participant has access).

(h)      **Deferrals**.  To the extent permitted by applicable law, the Board, in its sole discretion, may determine that the delivery of Common Stock or the payment of cash, upon the exercise, vesting or settlement of all or a portion of any Award may be deferred and may establish programs and procedures for deferral elections to be made by Participants.  Deferrals by Participants will be made in accordance with Section 409A of the Code.  Consistent with Section 409A of the Code, the Board may provide for distributions while a Participant is still an employee or otherwise providing services to the Company.  The Board is authorized to make deferrals of Awards and determine when, and in what annual percentages, Participants may receive payments, including lump sum payments, following the Participant's termination of Continuous Service, and implement such other terms and conditions consistent with the provisions of the Plan and in accordance with applicable law.

(i)      **Compliance with Section 409A of the Code**.  To the extent that the Board determines that any Award granted hereunder is subject to Section 409A of the Code, the Stock Award Agreement evidencing such Stock Award shall incorporate the terms and conditions necessary to avoid the consequences specified in Section 409A(a)(1) of the Code.  To the extent applicable, the Plan, Option Agreements and Restricted Stock Purchase Agreements shall be interpreted in accordance with Section 409A of the Code. Notwithstanding anything to the contrary in the Plan (and unless the Option Agreement or Restricted Stock Purchase Agreement specifically provides otherwise), if the shares of Common Stock are publicly traded, and if a Participant holding an Award that constitutes "deferred compensation" under Section 409A of the Code is a "specified employee" for purposes of Section 409A of the Code, no distribution or payment of any amount that is due because of a "separation from service" (as defined in Section 409A of the Code without regard to alternative definitions thereunder) will be issued or paid before the date that is six months following the date of such Participant's "separation from service" (as defined in Section 409A of the Code without regard to alternative definitions thereunder) or, if earlier, the date of the Participant's death, unless such distribution or payment can be made in a manner that complies with Section 409A of the Code, and any amounts so deferred will be paid in a lump sum on the day after such six month period elapses,

18

with the balance paid thereafter on the original schedule.

(j)  **Repurchase Limitation**.  The terms of any repurchase right will be specified in the Option Agreement or Restricted Stock Purchase Agreement.  The repurchase price for vested shares of Common Stock will be the Fair Market Value of the shares of Common Stock on the date of repurchase.  The repurchase price for unvested shares of Common Stock will be the lower of (i) the Fair Market Value of the shares of Common Stock on the date of repurchase or (ii) their original purchase price.  However, the Company will not exercise its repurchase right until at least six months (or such longer or shorter period of time necessary to avoid classification of the Award as a liability for financial accounting purposes) have elapsed following delivery of shares of Common Stock subject to the Award, unless otherwise specifically provided by the Board.

15.  **Amendment and Termination of the Plan.**  The Board may at any time amend or terminate the Plan.  Unless terminated sooner by the Board, the Plan will automatically terminate on the day before the 10th anniversary of the earlier of (i) the date the Plan is adopted by the Board, or (ii) the date the Plan is approved by the stockholders of the Company.  No Stock Awards may be granted under the Plan while the Plan is suspended or after it is terminated. In addition, to the extent necessary and desirable to comply with Applicable Laws, the Company shall obtain the approval of holders of capital stock with respect to any Plan amendment in such a manner and to such a degree as required.  Suspension or termination of the Plan will not impair rights and obligations under any Stock Award granted while the Plan is in effect except with the written consent of the affected Participant or as otherwise permitted in the Plan.

16.  **Conditions Upon Issuance of Shares.**  Notwithstanding any other provision of the Plan or any agreement entered into by the Company pursuant to the Plan, the Company shall not be obligated, and shall have no liability for failure, to issue or deliver any Shares under the Plan unless such issuance or delivery would comply with Applicable Laws, with such compliance determined by the Company in consultation with its legal counsel.  As a condition to the exercise of any Option or purchase of any Restricted Stock, the Company may require the person exercising the Option or purchasing the Restricted Stock to represent and warrant at the time of any such exercise or purchase that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is advisable or required by Applicable Laws.  Shares issued upon exercise of Options or purchase of Restricted Stock prior to the date, if ever, on which the Common Stock becomes a Listed Security shall be subject to a right of first refusal in favor of the Company pursuant to which the Participant will be required to offer Shares to the Company before selling or transferring them to any third party on such terms and subject to such conditions as is reflected in the applicable Option Agreement or Restricted Stock Purchase Agreement.

17.  **Beneficiaries.**  If permitted by the Company, a Participant may designate one or more beneficiaries with respect to an Award by timely filing the prescribed form with the Company.  A beneficiary designation may be changed by filing the prescribed form with the Company at any time before the Participant's death.  Except as otherwise provided in an Award Agreement, if no beneficiary was designated or if no designated beneficiary survives the Participant, then after a Participant's death any vested Award(s) shall be transferred or

19

distributed to the Participant's estate or to any person who has the right to acquire the Award by bequest or inheritance.

18.    **Approval of Holders of Capital Stock.**    If required by Applicable Laws, continuance of the Plan shall be subject to approval by the holders of capital stock of the Company within 12 months before or after the date the Plan is adopted or, to the extent required by Applicable Laws, any date the Plan is amended.    Such approval shall be obtained in the manner and to the degree required under Applicable Laws.

19.    **Addenda.**    The Administrator may approve such addenda to the Plan as it may consider necessary or appropriate for the purpose of granting Awards to Employees or Consultants, which Awards may contain such terms and conditions as the Administrator deems necessary or appropriate to accommodate differences in local law, tax policy or custom, which may deviate from the terms and conditions set forth in this Plan.    The terms of any such addenda shall supersede the terms of the Plan to the extent necessary to accommodate such differences but shall not otherwise affect the terms of the Plan as in effect for any other purpose.

20.    **Information to Holders of Options.**    In the event the Company is relying on the exemption provided by Rule 12h-1(f) under the Exchange Act, the Company shall provide the information described in Rule 701(e)(3), (4) and (5) of the Securities Act to all holders of Options in accordance with the requirements thereunder until such time as the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.    The Company may request that holders of Options agree to keep the information to be provided pursuant to this Section confidential.    If the holder does not agree to keep the information to be provided pursuant to this Section confidential, then the Company will not be required to provide the information unless otherwise required pursuant to Rule 12h-1(f)(1) of the Exchange Act.

20

**LIGHT FIELD LAB, INC.**
**2017 LIGHT FIELD LAB, INC. STOCK INCENTIVE PLAN**

**NOTICE OF STOCK OPTION GRANT**

[Optionee Name]
[Optionee Address Line 1]
[Optionee Address Line 2]

You have been granted an option to purchase Common Stock of Light Field Lab, Inc., a Delaware corporation (the "Company"), as follows:

| | |
|---|---|
| Date of Grant: | _____ |
| Exercise Price Per Share: | $_____ |
| Total Number of Shares: | _____ |
| Total Exercise Price: | $_____ |
| Type of Option: | _____ Shares Incentive Stock Option |
| | _____ Shares Nonstatutory Stock Option |
| Expiration Date: | _____ |
| Vesting Commencement Date: | _____ |
| Vesting/Exercise Schedule: | So long as your Continuous Service Status does not terminate (and provided that no vesting shall occur following the Termination Date (as defined in Section 5 of the Stock Option Agreement)), the Shares underlying this Option shall vest and become exercisable in accordance with the following schedule: _____ of the Total Number of Shares shall vest and become exercisable on the _____ anniversary of the Vesting Commencement Date and _____ of the Total Number of Shares shall vest and become exercisable on each _____ anniversary thereafter. |
| Termination Period: | You may exercise this Option for 3 month(s) after the Termination Date except as set out in Section 5 of the Stock Option Agreement (but in no event later than the Expiration Date). You are responsible for keeping track of these exercise periods following the Termination Date. The Company will not provide further notice of such periods. |
| Transferability: | You may not transfer this Option except as set forth in Section 6 of the Stock Option Agreement. |

*[Signature Page Follows]*

By your signature and the signature of the Company's representative or by accepting this grant, you and the Company agree that this Option is granted under and governed by the terms and conditions of this Notice and the Light Field Lab, Inc. 2017 Stock Incentive Plan and Option Agreement, both of which are attached to and made a part of this Notice.

In addition, you agree and acknowledge that your rights to any Shares underlying this Option will vest only as you provide services to the Company over time, that the grant of this Option is not as consideration for services you rendered to the Company prior to your date of hire, and that nothing in this Notice or the attached documents confers upon you any right to continue your employment or consulting relationship with the Company for any period of time, nor does it interfere in any way with your right or the Company's right to terminate that relationship at any time, for any reason, with or without cause, subject to Applicable Laws. Also, to the extent applicable, the Exercise Price Per Share has been set in good faith compliance with the applicable guidance issued by the IRS under Section 409A of the Code. However, there is no guarantee that the IRS will agree with the valuation, and by signing below, you agree and acknowledge that the Company, its Board, officers, employees, agents and stockholders shall not be held liable for any applicable costs, taxes, or penalties associated with this Option if, in fact, the IRS or any other person (including, without limitation, a successor corporation or an acquirer in a Change of Control) were to determine that this Option constitutes deferred compensation under Section 409A of the Code. You should consult with your own tax advisor concerning the tax consequences of such a determination by the IRS. For purposes of this paragraph, the term "Company" will be interpreted to include any Parent, Subsidiary or Affiliate.

**THE COMPANY:**

LIGHT FIELD LAB, INC.

By: _____    (Signature) _____

Name: _____    Title: _____

**OPTIONEE:**

_____

(PRINT NAME)

_____

(Signature) Address:

_____

_____

**LIGHT FIELD LAB, INC.**

**2017 LIGHT FIELD LAB, INC. STOCK INCENTIVE PLAN**

**STOCK OPTION AGREEMENT**

1.     **Grant of Option.**     Light Field Lab, Inc., a Delaware corporation (the "Company"), hereby grants to the person ("Optionee") named in the Notice of Stock Option Grant (the "Notice"), an option (the "Option") to purchase the total number of shares of Common Stock (the "Shares") set forth in the Notice, at the exercise price per Share set forth in the Notice (the "Exercise Price") subject to the terms, definitions and provisions of the Light Field Lab, Inc. 2017 Stock Incentive Plan (the "Plan") adopted by the Company, which is incorporated in this Stock Option Agreement (this "Agreement") by reference.  Unless otherwise defined in this Agreement, the terms used in this Agreement or the Notice shall have the meanings defined in the Plan.

2.     **Designation of Option.**     This Option is intended to be an Incentive Stock Option as defined in Section 422 of the Code only to the extent so designated in the Notice, and to the extent it is not so designated or to the extent this Option does not qualify as an Incentive Stock Option, it is intended to be a Nonstatutory Stock Option.

Notwithstanding the above, if designated as an Incentive Stock Option, in the event that the Shares subject to this Option (and all other incentive stock options granted to Optionee by the Company or any Parent or Subsidiary, including under other plans) that first become exercisable in any calendar year have an aggregate fair market value (determined for each Share as of the date of grant of the option covering such Share) in excess of $100,000, the Shares in excess of $100,000 shall be treated as subject to a nonstatutory stock option, in accordance with Section 5(c) of the Plan.

3.     **Exercise of Option.**     This Option shall be exercisable during its term in accordance with the Vesting/Exercise Schedule set out in the Notice and with the provisions of Section 7(c) of the Plan as follows:

(a)     **Right to Exercise.**

(i)     This Option may not be exercised for a fraction of a share.

(ii)     In the event of Optionee's death, Disability or other termination of Continuous Service Status, the exercisability of this Option is governed by Section 5 below, subject to the limitations contained in this Section 3.

(iii) In no event may this Option be exercised after the Expiration Date set forth in the Notice.

(b)     **Method of Exercise.**

(i)      This Option shall be exercisable by execution and delivery of the
Exercise Agreement attached hereto as <u>Exhibit A</u> or of any other form of written notice approved

for such purpose by the Company which shall state Optionee's election to exercise this Option, the number of Shares in respect of which this Option is being exercised, and such other representations and agreements as to the holder's investment intent with respect to such Shares as may be required by the Company pursuant to the provisions of the Plan. Such written notice shall be signed by Optionee and shall be delivered to the Company by such means as are determined by the Company in its discretion to constitute adequate delivery. The written notice shall be accompanied by payment of the aggregate Exercise Price for the purchased Shares.

(ii)     As a condition to the grant, vesting and exercise of this Option and as further set forth in Section 9 of the Plan, Optionee hereby agrees to make adequate provision for the satisfaction of (and will indemnify the Company and any Subsidiary or Affiliate for) any applicable taxes or tax withholdings, social contributions, required deductions, or other payments, if any ("Tax-Related Items"), which arise upon the grant, vesting or exercise of this Option, disposition of Shares, receipt of dividends, if any, or otherwise in connection with this Option or the Shares, whether by withholding, direct payment to the Company, or otherwise as determined by the Company in its sole discretion. Regardless of any action the Company or any Subsidiary or Affiliate takes with respect to any or all applicable Tax-Related Items, Optionee acknowledges and agrees that the ultimate liability for all Tax-Related Items is and remains Optionee's responsibility and may exceed any amount actually withheld by the Company or any Subsidiary or Affiliate. Optionee further acknowledges and agrees that Optionee is solely responsible for filing all relevant documentation that may be required in relation to this Option or any Tax-Related Items other than filings or documentation that is the specific obligation of the Company or any Subsidiary or Affiliate pursuant to Applicable Law, such as but not limited to personal income tax returns or reporting statements in relation to the grant, vesting or exercise of this Option, the holding of Shares or any bank or brokerage account, the subsequent sale of Shares, and the receipt of any dividends. Optionee further acknowledges that the Company makes no representations or undertakings regarding the treatment of any Tax-Related Items and does not commit to and is under no obligation to structure the terms or any aspect of the Option to reduce or eliminate Optionee's liability for Tax-Related Items or achieve any particular tax result. Further, if Optionee has become subject to tax in more than one jurisdiction, Optionee acknowledges that the Company or any Subsidiary or Affiliate may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(iii)     The Company is not obligated, and will have no liability for failure, to issue or deliver any Shares upon exercise of this Option unless such issuance or delivery would comply with the Applicable Laws, with such compliance determined by the Company in consultation with its legal counsel. Furthermore, Optionee understands that the Applicable Laws of the country in which Optionee is residing or working at the time of grant, vesting, and/or exercise of this Option (including any rules or regulations governing securities, foreign exchange, tax, labor or other matters) may restrict or prevent exercise of this Option. This Option may not be exercised until such time as the Plan has been approved by the holders of capital stock of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such Shares would constitute a violation of any Applicable Laws, including any applicable U.S. federal or state securities laws or any other law or regulation, including any rule under Part 221 of Title 12 of the Code of Federal Regulations as promulgated by the Federal Reserve Board. As a condition to the exercise of this Option, the Company may require Optionee to make any representation and warranty to the Company as may be required by the Applicable

Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Optionee on the date on which this Option is exercised with respect to such Shares.

(iv) Subject to compliance with Applicable Laws, this Option shall be deemed to be exercised upon receipt by the Company of the appropriate written notice of exercise accompanied by the Exercise Price and the satisfaction of any applicable obligations described in Section 3(b)(ii) above.

4. **Method of Payment.** Payment of the Exercise Price shall be by cash or check or, following the initial public offering of the Company's Common Stock, by Cashless Exercise pursuant to which the Optionee delivers an irrevocable direction to a securities broker (on a form prescribed by the Company and according to a procedure established by the Company).

Optionee understands and agrees that, if required by the Company to comply with Applicable Laws, any cross-border cash remittance made to exercise this Option or transfer proceeds received upon the sale of Shares must be made through a locally authorized financial institution or registered foreign exchange agency and may require Optionee to provide to such entity certain information regarding the transaction. Moreover, Optionee understands and agrees that the future value of the underlying Shares is unknown and cannot be predicted with certainty and may decrease in value, even below the Exercise Price. Optionee understands that neither the Company nor any Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between local currency and the United States Dollar or the selection by the Company or any Subsidiary or Affiliate in its sole discretion of an applicable foreign currency exchange rate that may affect the value of the Option (or the calculation of income or Tax-Related Items thereunder).

5. **Termination of Relationship.** Following the date of termination of Optionee's Continuous Service Status for any reason (the "Termination Date"), Optionee may exercise this Option only as set forth in the Notice and this Section 5. If Optionee does not exercise this Option within the Termination Period set forth in the Notice or the termination periods set forth below, this Option shall terminate in its entirety. In no event, may any Option be exercised after the Expiration Date of this Option as set forth in the Notice. For the avoidance of doubt and for purposes of this Option only, termination of Continuous Service Status and the Termination Date will be deemed to occur as of the date Optionee is no longer actively providing services as an Employee or Consultant (except to the extent Optionee is on a Company approved leave of absence) and will not be extended by any notice period or "garden leave" that is required contractually or under Applicable Laws.

(a) **General Termination.** In the event of termination of Optionee's Continuous Service Status other than as a result of Optionee's Disability or death or Optionee's termination for Cause, Optionee may, to the extent Optionee is vested in the Optioned Stock, exercise this Option during the Termination Period set forth in the Notice.

(b) **Termination upon Disability of Optionee.** In the event of termination of Optionee's Continuous Service Status as a result of Optionee's Disability, Optionee may, but

only within 12 month(s) following the Termination Date, exercise this Option to the extent Optionee is vested in the Optioned Stock.

(c)    **Death of Optionee.**  In the event of termination of Optionee's Continuous Service Status as a result of Optionee's death, or in the event of Optionee's death within 3 month(s) following Optionee's Termination Date, this Option may be exercised at any time within 18 month(s) following the Termination Date, or if later, 18 month(s) following the date of death by any beneficiaries designated in accordance with Section 17 of the Plan or, if there are no such beneficiaries, by the Optionee's estate, or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent Optionee is vested in the Optioned Stock.

(d)    **Termination for Cause.**  In the event of termination of Optionee's Continuous Service Status for Cause, this Option (including any vested portion thereof) shall immediately terminate in its entirety upon first notification to Optionee of such termination for Cause.  If Optionee's Continuous Service Status is suspended pending an investigation of whether Optionee's Continuous Service Status will be terminated for Cause, all Optionee's rights under this Option, including the right to exercise this Option, shall be suspended during the investigation period.

6.    **Non-Transferability of Option; ROFR Agreement; Voting Agreement.**

(a)    This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by him or her.  The terms of this Option shall be binding upon the executors, administrators, heirs, successors and assigns of Optionee.

(b)    As a condition precedent to entering into this Agreement, at the request of the Company, Optionee shall become a party to any right of first refusal and/or co-sale agreement to which the Company is a party at the time of Optionee's execution and delivery of this Agreement, or to which the holders of at least 50% of the outstanding shares of Common Stock may become parties after Optionee's execution and delivery of this Agreement, in each case as such right of first refusal and/or co-sale agreement may be amended from time to time (the "ROFR and Co-Sale Agreement"), by executing an adoption agreement or counterpart signature page agreeing to be bound by and subject to the terms of the Right of First and Co-Sale Agreement as a "Key Holder," if and as such term may be defined in the ROFR and Co-Sale Agreement.

(c)    As a condition precedent to entering into this Agreement, at the request of the Company, Optionee shall become a party to any voting agreement to which the Company is a party at the time of Optionee's execution and delivery of this Agreement, or to which the holders of at least 50% of the outstanding shares of Common Stock may become parties after Optionee's execution and delivery of this Agreement, in each case as such voting agreement may be amended from time to time (the "Voting Agreement"), by executing an adoption agreement or counterpart signature page agreeing to be bound by and subject to the terms of the Voting Agreement and to vote the Shares in the capacity of a "Key Holder" and a "Stockholder," if and as such terms may be defined in the Voting Agreement.

7.      **Lock-Up Agreement.**  If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Optionee shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Optionee shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

8.      **Effect of Agreement.**  Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof (and has had an opportunity to consult counsel regarding the Option terms), and hereby accepts this Option and agrees to be bound by its contractual terms as set forth herein and in the Plan.  Optionee hereby agrees to accept as binding, conclusive and final all decisions and interpretations of the Administrator regarding any questions relating to this Option.  In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of the Notice and this Agreement, the Plan terms and provisions shall prevail.

9.      **Imposition of Other Requirements.**  The Company reserves the right to impose other requirements on Optionee's participation in the Plan, on the Option and on any Award or Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with Applicable Laws or facilitate the administration of the Plan. Optionee agrees to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.  Furthermore, Optionee acknowledges that the laws of the country in which Optionee is working at the time of grant, vesting and exercise of the Option or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject Optionee to additional procedural or regulatory requirements that Optionee is and will be solely responsible for and must fulfill.

10.     **Electronic Delivery.**  The Company may, in its sole discretion, decide to deliver any documents related to Optionee's current or future participation in the Plan, this Option, the Shares subject to this Option, any other Company Securities or any other Company-related documents, by electronic means.  Optionee hereby (i) consents to receive such documents by electronic means, (ii) consents to the use of electronic signatures, and (iii) if applicable, agrees to participate in the Plan and/or receive any such documents through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.  To the extent Optionee has been provided with a copy of this Agreement, the Plan, or any other documents relating to this Option in a language other than English, the English language documents will prevail in case of any ambiguities or divergences as a result of translation.

11.     **No Acquired Rights.**  In accepting the Option, Optionee acknowledges that the Plan is established voluntarily by the Company, is discretionary in nature, and may be modified, amended, suspended or terminated by the Company at any time.  The grant of the Option is voluntary and occasional and does not create any contractual or other right to receive future

grants of Options, other Awards or benefits in lieu of Options, even if Options have been granted repeatedly in the past, and all decisions with respect to future grants of Options or other Awards, if any, will be at the sole discretion of the Company. In addition, Optionee's participation in the Plan is voluntary, and the Option and the Shares subject to the Option are extraordinary items that do not constitute regular compensation for services rendered to the Company or any Subsidiary or Affiliate and are outside the scope of Optionee's employment contract, if any. The Option and the Shares subject to the Option are not intended to replace any pension rights or compensation and are not part of normal or expected salary or compensation for any purpose, including but not limited to calculating severance payments, if any, upon termination.

             12.     **Data Privacy**. *Optionee hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of Optionee's personal data (as described below) by and among, as applicable, the Company and any Subsdiary or Affiliate for the exclusive purpose of implementing, administering, and managing Optionee's participation in the Plan. Optionee understands that refusal or withdrawal of consent may affect Optionee's ability to participate in the Plan or to realize benefits from the Option.*

          *Optionee understands that the Company and any Subsidiary or Affiliate may hold certain personal information about Optionee, including, but not limited to, Optionee's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in the Company or any Subsidiary or Affiliate, details of all Options or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in Optionee's favor ("*Personal Data*"). Optionee understands that Personal Data may be transferred to any Subsidiary or Affiliate or third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in the United States, Optionee's country, or elsewhere, and that the recipient's country may have different data privacy laws and protections than Optionee's country.*

13.    **Miscellaneous.**

           (a)     **Governing Law.**    The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

           (b)     **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)    **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in

writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

        (d)    **Successors and Assigns.**    Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

        (e)    **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

        (f)    **Severability.** If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision was so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

        (g)    **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

        (h)    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

**EXHIBIT A**

**LIGHT FIELD LAB, INC.**
**2017 LIGHT FIELD LAB, INC. STOCK INCENTIVE PLAN**

**EXERCISE AGREEMENT**

     This Exercise Agreement (this "<u>Agreement</u>") is made as of _____, by and between Light Field Lab, Inc., a Delaware corporation (the "<u>Company</u>"), and _____ ("<u>Purchaser</u>"). To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Company's 2017 Stock Incentive Plan (the "<u>Plan</u>") and the Option Agreement (as defined below).

     1.    **Exercise of Option.** Subject to the terms and conditions hereof, Purchaser hereby elects to exercise his or her option to purchase _____ shares of the Common Stock (the "<u>Shares</u>") of the Company under and pursuant to the Plan, the Notice of Stock Option Grant and the Stock Option Agreement granted _____ (the "<u>Option Agreement</u>"). The purchase price for the Shares shall be \$_____ per Share for a total purchase price of \$_____. The term "<u>Shares</u>" refers to the purchased Shares and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

     2.    **Time and Place of Exercise.** The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution and delivery of this Agreement, the payment of the aggregate exercise price by any method listed in Section 4 of the Option Agreement, and the satisfaction of any applicable tax, withholding, required deductions or other payments, all in accordance with the provisions of Section 3(b) of the Option Agreement. The Company shall issue the Shares to Purchaser by entering such Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company, against payment of the exercise price therefor by Purchaser. The Company will deliver to Purchaser a stock certificate or, in the case of uncertificated securities upon request, a notice of issuance, for the Shares as soon as practicable following such date.

     3.    **Limitations on Transfer.** The Shares are subject to any and all limitations on transfer created by the transfer restrictions set forth in the Voting Agreement, the ROFR and Co-Sale Agreement, and Applicable Law, and Purchaser shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions thereof.

     4.    **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

         (a)    Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment

for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b)     Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)     Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d)     Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 4(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 4(e) below.

(e)     Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f)     Purchaser represents that Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

(g)     Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

5.    **Restrictive Legends and Stop-Transfer Orders.**

(a)    **Legends.** Any stock certificate or, in the case of uncertificated securities, any notice of issuance, for the Shares shall bear the following legends (as well as any legends set forth in the ROFR Agreement, in the Voting Agreement, or required by the Company or applicable state and federal corporate and securities laws):

THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

(b)    **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

6.    **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

7.    **Waiver of Statutory Information Rights.** Purchaser acknowledges and understands that, but for the waiver made herein, Purchaser would be entitled, upon written demand under oath stating the purpose thereof, to inspect for any proper purpose, and to make copies and extracts from, the Company's stock ledger, a list of its stockholders, and its other books and records, and the books and records of subsidiaries of the Company, if any, under the circumstances and in the manner provided in Section 220 of the Delaware General Corporation Law (any and all such rights, and any and all such other rights of Purchaser as may be provided for in Section 220, the "Inspection Rights"). In light of the foregoing, until the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended, Purchaser hereby unconditionally and irrevocably waives the Inspection Rights, whether such Inspection Rights would be exercised or pursued directly or indirectly pursuant to Section 220 or otherwise, and covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any

claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The foregoing waiver applies to the Inspection Rights of Purchaser in Purchaser's capacity as a stockholder and shall not affect any rights of a director, in his or her capacity as such, under Section 220. The foregoing waiver shall not apply to any contractual inspection rights of Purchaser under any written agreement with the Company.

8.    **Miscellaneous.**

(a)    **Governing Law.**    The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b)    **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)    **Amendments and Waivers.**  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)    **Successors and Assigns.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)    **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f)    **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)    **Construction.**  This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h)    **Counterparts.**    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

(i)    **Electronic Delivery.**  The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means.  Purchaser hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

The parties have executed this Exercise Agreement as of the date first set forth above.

**THE COMPANY:**

LIGHT FIELD LAB, INC.

               By:                                         (Signature)

Name:                                    Title:

                     Address:

**PURCHASER:**

                                                    _____

(PRINT NAME)

(Signature) Address:

Email:                                   _____

Annex I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:
(A) In connection with the purchase or sale of any security;
(B) Involving the making of any false filing with the Commission; or
(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:
(A) In connection with the purchase or sale of any security;
(B) Involving the making of any false filing with the Commission; or
(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:
(A) At the time of such sale, bars the person from:
(1) Association with an entity regulated by such commission, authority, agency, or officer; (2) Engaging in the business of securities, insurance or banking; or
(3) Engaging in savings association or credit union activities; or
(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:
(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;
(B) Places limitations on the activities, functions or operations of such person; or
(C)Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:
(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or
(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to

conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

Case 4:23-cv-05344-YGR Document 1 Filed 10/19/23 Page 53 of 53