# Exhibit B

# The Law Offices of Alex Buerger

126 Jackson Building
318 Sixth Avenue South
Seattle, Washington 98104
Phone: (206) 405-4520
Facsimile: (206) 405-3233

---

July 12, 2023

                                          Via Email: johndohm@lightfieldlab.com
                                          and First Class Mail

Mr. John Dohm, COO
Light Field Lab, Inc.
1920 Zanker Rd. STE 10
San Jose, CA 95112

      **Re:**     **ALAN JONES**
                  **FOR SETTLEMENT PURPOSES ONLY**

Dear Mr. Dohm:

This office has been retained by Alan Jones with respect to his former employment with Light Field Lab, Inc. ("LFL"). Please direct all communication in this regard to this office.

Although Mr. Jones would like to resolve this matter on reasonable terms without litigation, he is not willing to do so under the terms outlined in LFL's initial severance offer. Mr. Jones devoted nearly four (4) years of his professional career to LFL and was actually very surprised that LFL terminated his employment and disappointed by the very small severance offer presented by LFL. Given his tenure at LFL and his valuable contributions, Mr. Jones expected a more generous severance package.

Additionally, I have completed my preliminary review of this case and I believe that Mr. Jones has strong claims against LFL for defamation/false light, disability discrimination and retaliation.

Below, I provide a brief factual summary of the case, analysis of legal liability and outline of damages. I conclude with a settlement offer to resolve this matter. I am hopeful that the parties can resolve this matter through negotiation and avoid litigation.

However, as a threshold matter, please be advised of LFL's obligation to preserve any and all documents relating to Mr. Jones' employment with LFL, including, without

Mr. John Dohm, COO
July 12, 2023
Page 2

limitation, all email and internal messaging on Matrix and KeyBase.

### A.     Factual Summary

Mr. Jones was employed by LFL from September 30, 2019, through June 23, 2023. Mr. Jones initially worked as a Senior Pipeline Software Engineer and was promoted to Principal Engineer on July 27, 2020.

Throughout his tenure at LFL, Mr. Jones consistently received positive feedback regarding his job performance, a merit pay increase when he was promoted to Principal Engineer and periodic incentive pay bonuses. He maintained positive personal relationships with his coworkers and management.

No one at LFL will seriously dispute the high quality of Mr. Jones' work at LFL. Mr. Jones was instrumental in the development of LFL's SolidLight holographic display platform.

Mr. Jones worked out of LFL's office from September 30, 2019, through March 7, 2020, and thereafter he worked remotely from his residence in Seattle, WA.

As you are aware, Mr. Jones is Type I Diabetic and suffers from a compromised immune system. Accordingly, Mr. Jones would be susceptible to severe illness and/or death if he were to contract COVID-19.

When LFL management announced that all of its employees would be required to return to in-office work by May 24, 2021, Mr. Jones requested that he be permitted to continue working remotely as an accommodation of his compromised immune system, which is a disability under federal and state law.

Although there does not appear to have been a formal accommodation process, LFL allowed Mr. Jones to continue working remotely and LFL management continued to provide Mr. Jones with positive feedback regarding his job performance. At no time did anyone in LFL management indicate that in-office work was an essential function of Mr. Jones' job duties.

In December 2022-January 2023, Mr. Jones' supervisor, Mr. Trevor Berninger, Director of Software, began having discussions with Mr. Jones to stop working remotely and return to in-office work at LFL. Mr. Jones was surprised because he had been working remotely since March 7, 2020, and there had been no complaints about his job performance.

When Mr. Jones asked if there were performance issues that would give rise to the

Mr. John Dohm, COO
July 12, 2023
Page 3

request that he return to in-office work, Mr. Berninger indicated that LFL did not have any issues with his job performance. When asked if there was a particular reason as to why LFL wanted him to return to in-office work, Mr. Berninger was very vague and unspecified and indicated that "it would just be better". Again, at no time did anyone at LFL indicate that working in-office was an essential job function of Mr. Jones' position.

Although Mr. Jones was open for discussion as to what would be reasonable accommodations for his return to in-office work, LFL did not engage in an interactive dialogue in this regard. In fact, Mr. Jones made repeated suggestions regarding masking protocol, testing protocol, social distancing and ventilation, but LFL did not respond to Mr. Jones' suggestions.

Mr. Jones understandably began to feel very marginalized by LFL management. He understood that LFL management wanted him to return to in-office work, but management was unwilling to implement a reasonable protocol to minimize his risk of exposure to COVID-19. Mr. Jones sensed that his relationships with LFL management were becoming strained, when he had previously enjoyed very positive relationships with leadership.

In January 2023, Mr. Jones was assigned to work on masking interference for Wavetracing Optics to improve image quality. Mr. Jones was working closely with LFL's CEO Mr. Jon Karafin who was the subject matter expert in this area; Mr. Karafin defined the scope of work and methodology of the work. In March 2023, Mr. Jones advised Mr. Karafin that the methodology was unworkable and was unlikely to result in improved image quality. Mr. Jones suggested a number of alternative approaches to improve image quality, but Mr. Karafin insisted that Mr. Jones continue with the methodology he himself had prescribed.

The matter came to a head on April 6, 2023, when Mr. Karafin made disparaging remarks regarding Mr. Jones' work on the Wavetracing Optics during a Software Team meeting that was attended by the entire software team of approximately 10 people. Mr. Karafin stated that it had been nearly six months and that Mr. Jones had failed to generate an image and indicated that it was unlikely that Mr. Jones' work would result in improved image quality.

Mr. Jones was absolutely dismayed that Mr. Karafin would publicly trivialize and disparage his work in such an aggressive manner in front of his coworkers. First, Mr. Karafin's statement was untrue; Mr. Jones had in fact generated images in January 2023. Second, Mr. Karafin's statement put Mr. Jones in a false light; it was Mr. Karafin's own methodology that was unworkable, and Mr. Jones had advised Mr. Karafin that the methodology was unlikely to result in substantial image improvement in early March, 2023. Despite Mr. Karafin's knowledge that the methodology he prescribed was

Mr. John Dohm, COO
July 12, 2023
Page 4

unworkable, he refused to change course. Instead, he scapegoated Mr. Jones and implied that the lack of progress in image improvement was due to Mr. Jones work performance, when he was well aware that the lack of progress was due to the fact that his own methodology had proved to be unworkable.

During the entire course of his career, Mr. Jones had never been subjected to such an unwarranted public denigration and trivialization of his work performance. Accordingly, on April 9, 2023, Mr. Jones submitted a rebuttal of Mr. Karafin's disparaging comments and a complaint of hostile work environment.

LFL conducted an investigation of Mr. Jones' hostile work environment complaint. When Mr. Jones was interviewed by the investigator, he explained that he believed that Mr. Karafin's animosity towards him was due to the fact that he was working remotely because of his disability. Mr. Jones also explained that he had been under increased pressure from LFL to return to in-office work, despite his disability.

Mr. Jones continued working on interference masking on the Wavetracing Optics and upon implementation of Mr. Karafin's methodology, it became apparent to LFL that the methodology did not result in substantial image improvement and, in fact resulted in a substantial reduction in the field of view. The technical concerns that Mr. Jones outlined in his complaint of April 9, 2023, were substantiated.

On June 16, 2023, Mr. Jones received an email indicating that the investigation had been concluded and that his hostile work environment claim had not been substantiated.

On June 23, 2023, Mr. Jones' employment was terminated during a conference call with you and Mr. Brendan Bevensee, CTO. During the conference call it was indicated that "things aren't working out" and with the conclusion of the investigation, LFL was terminating Mr. Jones employment. There was no indication in the phone conference that LFL was terminating Mr. Jones for poor performance or unprofessional behavior.

Later in the day on June 23, 2023, Mr. Jones received a letter of termination which stated that his employment was being terminated for poor performance and unprofessional behavior. Mr. Jones was shocked; during his nearly four (4) year tenure at LFL, no one had complained about poor performance or unprofessional behavior. Notably, the termination letter states that the decision to terminate Mr. Jones' employment was made prior to the initiation of his hostile work environment complaint of April 9, 2023.

### B.     *Legal Liability*

Without limitation, and based on the information provided to me, it is apparent that Mr. Jones has strong claims against LFL for defamation/false light, disability discrimination

and retaliation.

### i. Defamation/False Light

Mr. Jones has claims against LFL for defamation and false light based upon Mr. Karafin's public disparagement of Mr. Jones during the April 6, 2023, Software Team meeting. During the meeting, Mr. Karafin stated that after nearly six months of work that Mr. Jones had failed to generate an image and indicated that it was unlikely that Mr. Jones' work would result in improved image quality.

Not only was Mr. Karafin's public thrashing of Mr. Jones extremely unprofessional, but his statements were defamatory and put Mr. Jones in a false light.

Mr. Karafin was fully aware that Mr. Jones had successfully generated multiple images in early January, 2023; his statement was false, defamatory and malicious.

Mr. Karafin also put Mr. Jones' job performance in a false light when Mr. Karafin indicated that Mr. Jones' work was unlikely to result in improved image quality. The clear implication of Mr. Karafin's statement is that the lack of progress on improved image quality was due to Mr. Jones' job performance. However, he neglected to explain that he himself had prescribed the methodology that Mr. Jones was implementing, and that Mr. Jones had repeatedly advised Mr. Karafin that his methodology was unlikely to improve image quality.

Mr. Karafin was fully aware that he had crossed the line of professionalism during the meeting and attempted to "walk back" his statements by saying "that came out wrong", However, he failed to clarify that the lack of progress on image quality was due to the fact that his own methodology was unworkable.

Instead of taking ownership of the project, Mr. Karafin scapegoated Mr. Jones and spun the false narrative that the lack of progress on improved image quality was due to Mr. Jones' job performance.

### ii. Disability Discrimination.

Mr. Jones also has strong claims against LFL for disability discrimination under federal and state law.

Under applicable federal and state law, an employer must provide reasonable accommodation to a disabled employee and is prohibited from discriminating against a disabled employee. LFL failed both of its obligations in regard to Mr. Jones.

In the age of COVID-19, it is undisputed that immunocompromised employees are protected under federal and state employment laws because they are susceptible to serious illness and/or death if they contract COVID-19. It is also undisputed that remote work is a reasonable accommodation for immunocompromised employees, unless the

Mr. John Dohm, COO
July 12, 2023
Page 6

employer can show that in-office work is an essential job function or that remote work would be an undue burden on the employer.

Because LFL permitted Mr. Jones to work remotely for 19 months, it will be unable to establish that in-office work was an essential job function of Mr. Jones' position or that his remote work would be an undue burden to its business.

Although LFL permitted Mr. Jones to work remotely, LFL management made it very clear to Mr. Jones that they wanted him to stop working remotely and return to in-office work. With the roll-out of COVID-19 vaccinations and the decreased rate of COVID-19 infections, during the last six (6) months of his employment, Mr. Jones was under increased pressure from LFL management to return to in-office work.

However, LFL did not communicate that in-office work was an essential job function or that Mr. Jones' remote work was creating an undue hardship; Mr. Berninger was very vague and unspecified and indicated only that "it would just be better" if Mr. Jones returned to in-office work.

Although it probably would have been better if Mr. Jones had been permitted to work in-office, LFL made no effort to accommodate his return to in-office work. LFL did not engage in an interactive dialogue regarding reasonable accommodation to minimize Mr. Jones' risk of COVID-19 exposure. LFL refused to discuss basic COVID-19 mitigation measures of masking protocol, testing protocol, social distancing, ventilation and hygiene that would have enabled Mr. Jones to safely return to in-office work.

Not only did LFL fail to accommodate Mr. Jones' return to in-office work, it failed to accommodate Mr. Jones' remote work. Throughout the time that Mr. Jones worked remotely, he became increasingly marginalized and isolated from the workflow at LFL. Although he did attend the Software Team meetings, there were often significant deadlines and developments in the LFL office that Mr. Jones was unaware of and LFL made no effort to facilitate communication with Mr. Jones. As a result, Mr. Jones became increasingly isolated and marginalized in his role.

This marginalization became increasingly problematic during the last six months of Mr. Jones' employment when he was working on the interference masking on the Wavetracing Optics with Mr. Karafin. Despite the fact that Mr. Jones informed both Mr. Karafin and Mr. Berninger that the image improvement work was presenting significant problems, neither Mr. Karafin nor Mr. Berninger provided significant support to overcome those problems or were open to Mr. Jones suggestions for alternative solutions to improve image quality.

Mr. Jones was under the distinct impression that he was being set up for failure and his impression was confirmed when Mr. Karafin made his baseless complaints about Mr. Jones' job performance during the April 6, 2023, Software Team meeting.

Mr. John Dohm, COO
July 12, 2023
Page 7

The evidence in this case indicates that LFL failed to accommodate Mr. Jones return to in-office work and failed to accommodate his remote work. The evidence also indicates that LFL intentionally discriminated against Mr. Jones when it terminated his employment.

Instead of working with Mr. Jones to accommodate his disability, LFL marginalized Mr. Jones and ultimately terminated his employment on June 23, 2023, under the pretext of poor performance and unprofessional behavior.

    *iii.*    *Retaliation*

Mr. Jones also has a strong claim against LFL for retaliation. Retaliation is prohibited under both federal and state law.

Although Mr. Jones complaint of April 9, 2023, was a hostile work environment claim, when he was interviewed by the investigator, he explained that he believed that Mr. Karafin's animosity towards him was due to the fact that he was working remotely because of his disability. He also explained that LFL had been pressuring him to return to in-office work since December, 2022.

Retaliation is a basis of liability that is separate and apart from the underlying discrimination claim. Therefore, to prevail on a retaliation claim, it is not necessary to prove that discrimination actually occurred, but only that the employee was retaliated against for reporting conduct that was reasonably believed to be harassment or discrimination. For example, in a Washington State case, the jury awarded $11.7 million in damages on an employee's retaliation claim, even though the jury found the underlying discrimination claim to be without merit. ***Passantino v. Johnson & Johnson***, 982 F.Supp. 786 (1997).

In this case, Mr. Jones reported conduct that he reasonably believed was motivated by unlawful discrimination. Additionally, the temporal proximity between the conclusion of the investigation on June 16, 2023, and the termination of Mr. Jones' employment a week later on June 23, 2023, indicates that LFL acted with retaliatory intent. The temporal proximity between the conclusion of the investigation and the termination of Mr. Jones employment raises a rebuttable presumption of retaliatory intent. ***Estevez v. Faculty Club of University of Washington***, 129 Wn.App. 774, 120 P.3d 579 (Div. 1 2005).

Accordingly, we are very skeptical of LFL's claim that it made a decision to terminate Mr. Jones' employment prior to the submission of his hostile work environment claim of April 9, 2023.

We are also skeptical of LFL's claims that it terminated Mr. Jones' employment for unprofessional behavior and poor performance and view these claims as just a pretext for

Mr. John Dohm, COO
July 12, 2023
Page 8

unlawful discrimination. In terms of his behavior, Mr. Jones never engaged in anything near the unprofessional behavior that he endured on April 6, 2023, when Mr. Karafin trashed his work performance in public with impunity and without apology.

In regard to poor work performance, LFL will be unable to establish that Mr. Jones was terminated for poor work performance. LFL management never brought any job performance concerns to Mr. Jones either orally or in writing until April 6, 2023. In fact, Mr. Berninger advised Mr. Jones in December 2022, that LFL had no problems with Mr. Jones' job performance.

LFL will have a very difficult time defending this case. The evidence indicates a wholesale failure on the part of LFL to accommodate Mr. Jones' disability and that he was subjected to intentional discrimination when he was terminated because of his disability and in retaliation of his complaint of discrimination on the pretext of unprofessional behavior and poor performance.

C.   *Damages*

Assuming we are successful in bringing forth his claims, LFL would be liable for Mr. Jones' economic and emotional damages. Economic damages would include back pay and lost benefits with an award of front pay and benefits. Because of Mr. Jones' limitations on in-office work, we estimate that it may take him up to a year to secure suitable substitute employment. During this time, Mr. Jones will be required to pay out-of-pocket for medical insurance for himself and his family.

In terms of his equity interest in LFL, Mr. Jones will suffer the loss of ███████ LFL shares that are vested because he cannot afford to exercise those options due to tax liability and the 90-day expiry of his options. Additionally, Mr. Jones will suffer the loss of ███████ unvested shares to which he would have been entitled had LFL not wrongfully terminated his employment.

Although it is often difficult to value the stock of privately held companies, it is our understanding that LFL investors are currently purchasing LFL stock for approximately $███ per share.  At a current value of $███ per share, Mr. Jones will suffer a loss of approximately $███████ on the ███████ LFL shares that are vested and $███████ on the ███████ shares that were unvested at the time of his termination. By our calculations, Mr. Jones will suffer a loss of equity of approximately $███████. Of course, that number could go substantially higher in the event that LFL were to be acquired and/or do an IPO.

Emotional damages are also significant in this case. Mr. Jones suffered severe emotional damages as a result of the discrimination he experienced at LFL. He suffered significant depression during his employment at LFL because of his marginalization and the pressure

Mr. John Dohm, COO
July 12, 2023
Page 9

to return to in-office work. As a result, Mr. Jones was prescribed antidepressants and treated with a behavioral health counselor.

Mr. Jones' depression has been exacerbated by the termination of his employment and he has also developed an anxiety disorder that will likely result in additional medication and behavioral health counseling.

Although it is always difficult to put a value on emotional damages, given the record of treatment, an emotional damage award in excess of $██████ would be typical for this type of case.

In addition to economic and emotional damages, Mr. Jones may also be entitled to punitive damages under state and federal law. Based upon my evaluation of this case, I believe at trial we would successfully prove intentional discrimination and recover punitive damages against LFL. Case law in California would support a punitive damage award of at least two times the compensatory damages awarded to Mr. Jones in the amount of $████████. ***See Contreras-Velazquez v. Family Health Centers of San Diego, Inc.***, Case No: D076601, CA4, 4/7/2021.

Of course, my client would also be entitled to reimbursement of his attorney's fees, and litigation costs. As in most discrimination cases, it could be very expensive to litigate this case. To prepare for arbitration it would be necessary to conduct numerous depositions of current and former employees of LFL. For this type of case, it would not be unusual for each party to incur attorney fees and costs in excess of $█████████ non-inclusive of LFL's arbitration costs and fees which easily could exceed $████████.

It has been my experience with these types of cases that early settlement discussions are often productive; the time and expense of protracted litigation often diverts company resources and energy away from more constructive management activities.

In addition to the cost of arbitration and its own defense costs, based on my evaluation of the case, LFL has liability exposure in the approximate amount of $████████, as outlined below:

1. $██████      Wage Loss-1 year
2. $██████      COBRA Medical Insurance-1 year
3. $██████      Equity Loss
4. $██████      Emotional Damages
5. $██████      Punitive Damages
6. $██████      Attorney's Fees and Costs.
   $██████      **Total Liability Exposure**

Mr. John Dohm, COO
July 12, 2023
Page 10

Mr. Jones would prefer to avoid litigation and bring closure to his employment experience at LFL. He understands that litigation is time consuming, expensive, and inevitably uncertain. Likewise, it would be in the best interests of LFL to explore early settlement possibilities and avoid the expense and inevitable risk of protracted litigation.

To this end, Mr. Jones is willing to execute a full release of claims with confidentiality in exchange for payment of $███████. Additionally, Mr. Jones would require an extension of the exercise date on his vested LFL stock options from three (3) months to five (5) years. Based upon LFL's liability exposure, I believe that this is an extremely reasonable early settlement offer.

If LFL is unwilling to resolve Mr. Jones' claims as outlined above, then he will pursue all of the damages to which he is entitled under the law, including not only back pay and front pay with additional equity compensation, but also emotional distress and punitive damages, along with attorney fees and costs. My client is committed to ensuring that this matter is resolved on reasonable terms which recognize his dedication to his LFL employment and the damages he has suffered as a result of the termination of his employment and the discrimination he endured at LFL.

In the interim, I will prepare to file a charge of discrimination with the California Civil Rights Department and the Equal Employment Opportunity Commission. I am requesting that LFL furnish me with a copy of Mr. Jones' personnel file. I am also requesting that LFL provide me with a copy of the investigative file for Mr. Jones' hostile work environment complaint of April 9, 2023.

This settlement offer will remain open until the close of business on July 25, 2023.

I am hopeful that the parties are able to resolve this matter on reasonable terms without protracted litigation.

Very truly yours,

THE LAW OFFICES OF ALEX BUERGER

*/s/ Alex Buerger*

Alex Buerger

Cc:     Mr. Alan Jones